**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Dravon Ames,

         Plaintiff,

v.

City of Tempe, et al.,

         Defendants.

No. CV-20-02102-PHX-DWL

**ORDER**

    Dravon Ames ("Plaintiff") alleges that Officers Cameron Payne and Cody Conklin of the Tempe Police Department violated his Fourth and Fourteenth Amendment rights by using excessive force against him. Plaintiff also asserts a 42 U.S.C. § 1983 claim against the City of Tempe (the "City"), alleging municipal liability for the officers' conduct. Now pending before the Court is a motion for summary judgment filed by Officers Payne and Conklin and the City (together, "Defendants"). (Doc. 113.) For the following reasons, the motion is granted.

## BACKGROUND

I.   <u>Factual Background</u>

    This litigation arises from Officers Payne's and Conklin's use of force against Plaintiff on October 31, 2018. Because the summary judgment analysis turns, in significant part, on which version of the facts must be accepted, the Court begins with a detailed factual summary, indicating as appropriate where one side's version of the facts need not be credited.

Although many of the material facts are undisputed (including the officers' actions throughout the encounter), the parties' motion papers provide sharply different accounts of *Plaintiff's* conduct—Defendants assert that Plaintiff physically resisted and attempted to leave, while Plaintiff describes his behavior as compliant and nonthreatening.  However, the parties rely on the same exhibits to support their respective positions.  Specifically, both sides submitted video footage of the incident, captured by the officers' body cameras. (Doc. 116 [Defendants' notice of filing of body camera footage]; Doc. 124 [Plaintiff's notice of the same]).  Additionally, both sides cite the deposition testimony of Officers Payne and Conklin.  (Docs. 113-10 [Payne dep.], 113-11 [Conklin dep.], 119-4 [Conklin dep.], 119-6 [Payne dep.].)  In contrast, Plaintiff does not provide any sworn testimony.

During oral argument, Plaintiff sought to justify his failure to provide a competing account of the encounter by arguing that, because the video evidence is often too blurry and/or misdirected to conclusively establish what happened, the officers' testimony regarding the various ways he engaged in resistance over the course of the encounter must be disregarded for summary judgment purposes.  This argument is unavailing.  As an initial matter (and as discussed in more detail below), in some instances the video evidence corroborates the officers' account and contradicts the competing narrative that Plaintiff's counsel has attempted to construct in Plaintiff's motion papers.  In those instances, even if Plaintiff *had* submitted a declaration or deposition testimony disputing the officers' account (which, again, Plaintiff failed to do), the Court would be required under Rule 56 to reject Plaintiff's account in light of the contradictory video evidence.  *Hernandez v. City of Gilbert*, 989 F.3d 739, 743 (9th Cir. 2021); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

But Plaintiff also misunderstands the evidentiary value of the video footage that is blurry and/or misdirected.  To give one example (and as discussed in more detail below), Officer Conklin testified that Plaintiff attempted to grab his gun during a portion of the

encounter.  No reasonable juror could find that the available video footage corroborates or contradicts Officer Conklin's testimony on this point—the cameras are blocked or pointed elsewhere.  Although Plaintiff argues that the absence of corroboration means that Officer Conklin's testimony on this point must be disregarded, this reflects a misunderstanding of how Rule 56 works.  When, as here, "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  *See also Scott*, 550 U.S. at 380 ("At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'").  Thus, it was not enough for Plaintiff to attempt to create "metaphysical doubts" about the accuracy of the officers' sworn testimony by pointing to video footage that no reasonable juror could view as confirming or contradicting that testimony.  *See also Baker v. Tevault*, 2022 WL 7033701, *3 n.5 (D. Ariz. 2022) ("Plaintiff claims to dispute this sequence of events, stating that Officer Tevault first released Plaintiff's left hand to free his own hand to slam Plaintiff into the vehicle, and Plaintiff then put out his left hand to protect his face from hitting the car door.  In support, Plaintiff relies solely on the [video] footage and the interpretation of counsel regarding what the video shows.  The opinions of counsel are not evidence.  Additionally, the video clearly shows that Plaintiff pulled out and raised his left hand while he was arguing with Tevault, and it is not clear from the video that Tevault first let go of Plaintiff's left hand or pushed Plaintiff.  The mere fact that not every action is observable or clear from the video evidence is insufficient to create a genuine issue of material fact regarding Tevault's first-hand sworn testimony about what occurred.") (citations omitted).[1]

---

[1]     To be clear, if Plaintiff had identified snippets of the video footage that a reasonable juror could construe as contradicting the officers' account, this would be sufficient to create a genuine dispute of fact for summary judgment purposes.  For example, if the officers had testified that Plaintiff was holding a gun when they initially encountered him, but the video footage showed that Plaintiff was empty-handed upon the officers' approach, such a

1     With these principles in mind, the relevant facts for summary judgment purposes

2 are as follows:[2]

3     **A.     Initial Encounter**

4     On October 31, 2018, around 5:00 AM, Officers Payne and Conklin were dispatched

5 to a possible traffic accident at the intersection of Rural Road and University Drive in

6 Tempe, Arizona. (Doc. 119-1 at 2, 4.) Officer Conklin arrived first. (*Id.* at 2.) The video

7 footage from Officer Conklin's body camera, which was enclosed as Exhibit 3 to

8 Defendants' motion, shows the following:

9     As Officer Conklin exits his vehicle, Plaintiff is standing in the middle of the street

10 near a black sedan, wearing socks (but not shoes) and gloves. The driver's side front door

11 of the sedan is ajar:



21    conflict would be resolved in Plaintiff's favor as the non-movant.

22    [2]     During oral argument, Plaintiff's counsel requested permission to supplement the record by submitting a declaration from Plaintiff. This request is denied. Plaintiff had a full and fair opportunity to respond to Defendants' summary judgment motion. Nor is Plaintiff's supplementation request compliant with Rule 56(d). It would be unfair to Defendants and inefficient from a case management perspective to allow the entire summary judgment process to run its course, only for Plaintiff to essentially restart the process on the eve of the Court's ruling by belatedly submitting evidence that has always been available to him. *Cf. Henry v. Adventist Health Castle Med. Ctr.*, 970 F.3d 1126, 1133 n.5 (9th Cir. 2020) ("[T]he district court did not abuse its discretion in denying Henry's request for a continuance to conduct further discovery and/or supplement the record . . . [and] did not abuse its discretion in denying Henry's motion for reconsideration under Federal Rule of Civil Procedure 59(e) because the motion and Henry's belated declaration improperly attempted to introduce additional evidence that 'could reasonably have been raised earlier in the litigation'") (citations omitted).

- 4 -

Plaintiff is mid-sentence as the video begins:

Plaintiff: "—I'm in an area I don't fucking know."

Officer Conklin: "Dude, come over here.  You're going to get hit by a car."

Plaintiff: "Alright, bro.  But I don't trust—"

Officer Conklin: "You don't trust me?"

Plaintiff: "I don't trust police, bro!"  I always get fucking—"

Officer Conklin: "Too bad!  Now you're in this situation."

At this point, a second police vehicle can be seen pulling up behind Plaintiff.

Plaintiff: "I always get fucking harassed by police, bro.  All the time, bro.  I've paid over $4,000 in tickets, bro."

Officer Conklin: "Why are you—why?"

Plaintiff: "Cause they're fucking driving tickets bro.  I always fucking go.  I don't even do shit."

Officer Conklin: "Dude, I'm just trying to figure out what's going on."

In the footage captured by Officer Conklin's camera, Officer Payne can be seen exiting the second police vehicle.  The footage from Officer Payne's body camera (which was enclosed as Exhibit 4 to Defendants' motion), viewed together with the footage from Officer Conklin's camera, shows the following:

Officer Payne: "Why are you standing in the middle of the road?"

Plaintiff: "Shit—I took my fucking first dab, with my white buddies, at Amazon.  I work at Amazon.  And we were just fucking smoking.  And I don't smoke weed at all, you know what I mean.  I just took a fucking dab.  I've never—"

Officer Payne, gesturing toward the sidewalk (but not touching Plaintiff): "Okay.  Let's go over here."

Plaintiff: "You know what I mean?"

Officer Payne: "Hey, hey, hey, hey!"

Plaintiff: "But I'm—I'm not—but I'm not—"

Officer Payne: "We're walking over to the sidewalk."

1    Officer Conklin: "Are you kind of tripping right now on it?"

2    Plaintiff: "Hey, but look, sir–"

3    Officer Payne: "I don't want to get my ass run over![3]  Walk over there!"

4    Plaintiff: "But what I'm not, I'm not, I'm not under arrest—"

5    Officer Payne: "You're not listening, right, got it."

6    Plaintiff: "I didn't do anything wrong.  You know what I mean?  I, I, I—I'm a good

7    dude.  I take care of my daughter, bro, I got to work, and I go home, and I sleep, bro."

8    Officer Conklin: "Okay."

9    Plaintiff: "Hey as much as I can, the fucking four hours I get.  I—I don't do a lot

10   like you guys—"

11   Officer Conklin: "Alright, so you're tired."

12   Plaintiff: "—I'm not out yet but I'm tired as fuck."

13   Officer Conklin: "Okay, I get that, dude—"

14   Plaintiff: "I'm tired as shit, bro.  And I'm always getting fucking pulled over—"

15   Officer Conklin: "Can I get you—can I get you out of the road?"

16   Plaintiff: "Bro, this is the first time I've smoked, bro.  They've been trying to make

17   me smoke with them for like six months.  I always said 'no' and—"

18   Officer Payne: "Dude, stop talking and listen."

19   Plaintiff: "And it was my birthday yesterday.  I promise you it was my birthday

20   yest—"

21   Officer Conklin (speaking over Plaintiff): "Stop talking.  Stop talking."

22   Officer Payne: "Stop, talking."

23   Plaintiff: "It was my birthday yest—"

24   Officer Conklin: "Stop talking.

25   Officer Payne: "You're still talking."

26   Plaintiff reaches in his pocket and pulls out an Airhead candy.

27   Plaintiff: "It was my birthday yesterday."

28   

---

[3]    Mid-sentence, Plaintiff can be heard saying, "I know!"

1     Officer Conklin: "Stop talking."

2     Plaintiff, looking at the Airhead: "Alright, I got some candy.  Can I get my ID, just

3  to show you guys that it was my birthday yesterday and my name's Dravon—"

4     Officer Conklin: "Is your ID in your car?"

5     Plaintiff: "Yeah, my name's Dravon, bro.  You know what I mean.  I'm good."

6     At this point (which is the 1:49 time-elapsed mark in the footage from Officer

7  Payne's body camera), Officer Payne walks to a gas station and speaks with another

8  individual, who it appears was involved in a traffic incident.  Officer Conklin and Plaintiff

9  walk to Plaintiff's car and continue to converse (as captured on Office Conklin's body

10 camera at the 1:42 mark):[4]

11    Plaintiff: "Yeah, yeah, I have no reason to be arrested.  I've been real with you guys.

12 You know what I mean.  It was my birthday yesterday.  I just want to show you.  You know

13 what I mean.  Like, if I'm keeping it real with you, can you just like, chill out on me, bro?"

14    Officer Conklin: "We are chill!  You're the one freaking out on us!"

15    Plaintiff leans over and reaches into his car.

16    Plaintiff: "Alright, cause I took my first dab, bro, I don't smoke weed."

17    Officer Conklin: "I know."

18    Plaintiff: "Okay!"

19    Plaintiff shows what appears to be his driver's license to Officer Conklin.

20    Officer Conklin, reaching to take the license: "Let me see it."

21    Plaintiff: "Look, look!  [Plaintiff's date of birth]."

22    Officer Conklin: "Okay."

23    Plaintiff: "Alright, bro.  Can you can give it back?  I, I—"

24    Officer Conklin: "Where's your licen—where's your registration and insurance at?"

25    Plaintiff, gesturing toward his car: "It's all in there, it's all in there."

26    Officer Conklin: "Alright, can you go and grab it for me?"

27

28

---

[4]     The officers' body cameras did not begin filming at the exact same time, so an event depicted at a particular time in Officer Conklin's body camera footage will be depicted at a different time in Officer Payne's body camera footage.

1    Plaintiff: "Well, yeah, okay."

2    Plaintiff again leans over and reaches into the car.

3    Plaintiff: "I have a photo right here.  It's not in my car but it's still my car.  I'm

4    covered, he should be covered, I have all that.  It should be fine."

5    Officer Conklin: "Okay.  So, what happened?"

6    Plaintiff: "My car just—"

7    Officer Conklin: "Why is your car—"

8    Plainitff: "It just stopped, it just stopped on me!"

9    Officer Conklin: "It just stopped?  You didn't—"

10   Plaintiff: "Shit, I was about—I didn't get gas and I'm driving.  I don't even know

11   where the fuck I'm at right now."

12   Officer Conklin: "You didn't get hit?  You didn't hit anyone?"

13   Plaintiff: "I—no.  I didn't hit anyone.  I was driving kinda like crazy, I'm not gonna

14   lie but I'm—I—I always do that—I always get where I have to go, I don't do that.  You

15   guys drive crazy too I see it all that time.  You guys—"

16   Officer Conklin: "What do you mean we drive crazy?  We don't stop in the middle

17   of the road like this."

18   Plaintiff: "Nah, I don't do that crazy stuff, but you know what I mean, I'm just

19   chilling, man.  Like, I'm a young dude.  I'm twenty-two."

20   At this point, Officer Payne walks back toward Plaintiff and Officer Conklin.

21   Officer Conklin: "Yes, you are."

22   Plaintiff: "I just turned twenty-two, bro."

23   Officer Payne, gesturing toward the gas station with his head: "Yeah, I got damage

24   on his car."

25   Plaintiff: "I just turned twenty-two, man."

26   Officer Conklin: "What?"

27   Officer Payne: "I got damage on his car."

28   Officer Conklin: "Okay, does he—does he say what happened?"

1    Plaintiff: "You got the damage on his car?"

2    Officer Payne, pointing at Plaintiff: "I—I haven't—I'm just more concerned about

3    getting these guys out of the road so we don't have anything more happen."

4    Plaintiff: "Alright, I just turned twenty-two.  I just turned twenty-two."

5    Officer Conklin: "Yeah, I'm not happy about his car though."

6    Plaintiff: "Yesterday.  My birthday's the 30th."

7    Officer Payne: "Yeah, I know."

8    Plaintiff: "I'm fine, I swear to you!"

9    Officer Conklin: "You said you just took a dab."

10    Plaintiff: "I'm gonna try to go put some gas in there, bro.  I did but that was like two

11    hours ago.  I got off work early—I set my vacation, bro.  Because I haven't been getting

12    no sleep.  I'm about to go home and sleep.  I—I've been busting my ass at work.  I've been

13    doing good, I just need—"

14    Officer Conklin: "Good."

15    Plaintiff: "I don't smoke weed, bro.  I just got high.  I always get tripping up when

16    I smoke, though.  I don't—cause I don't.  I used to a lot—"

17    Officer Conklin: "Do you have a medical marijuana card?"

18    Plaintiff: "Hm?"

19    Officer Conklin: "Do you have a medical marijuana card?"

20    Plaintiff nods.

21    Officer Conklin: "Yeah?  Can I see it?"

22    Plaintiff: "The person have, yeah—"

23    Officer Conklin: "Oh, but you don't have it?"

24    Plaintiff: "I'm just saying, bro."

25    Officer Conklin: "Yeah, I—"

26    Plaintiff: "I've—I've been being honest with you, bro."

27    Officer Conklin: "No, I know."

28    Plaintiff: "Cause you're asking me questions and stuff."

Officer Conklin: "I'm asking do you have a medical marijuana card?"

Plaintiff again turns and reaches into his car but does not appear to grab anything.

Plaintiff: "Bro, I—I'm about to go, bro.  Where's my ID at?"

Officer Conklin: "No, you're not going anywhere."

Plaintiff: "—You—I'm not under arrest, bro.  Can you get my ID?"

Officer Conklin: "You're detained.  You're not free to go."

Plaintiff: "No, I'm not detained!"

Officer Conklin: "Don't tell me what you are and what you're not.  I'm telling you what you are and what you're not."

Plaintiff: "Can you tell me—can you tell me the grounds?  You can't tell me the grounds, bro."

Plaintiffs tries to turn away from Officer Conklin, who blocks Plaintiff's movement with his hand.

Plaintiff: "It's late.  It's late, bro.  It's late bro.  Don't do that to me right now.  It's late."

Officer Conklin: "Don't do what to you right now?"

Plaintiff: "Don't be trying to bust me up, bro.  It's late."

Plaintiff then turns so that his back is facing Officer Conklin, who grips Plaintiff's shoulder and shines his flashlight on Plaintiff's back.

Officer Conklin: "You're not making any sense right now."

Plaintiff: "It's late.  No, I am making—I'm making a lot of sense, bro.  Please.  Sir—."

B.    **The Incident**

Much of the controversy in this case turns on Plaintiff's conduct during the next several minutes of the encounter.  Because the video footage becomes less clear after the officers begin attempting to detain Plaintiff and Plaintiff does not provide a first-hand account of his own conduct, many of the facts are derived from the officers' deposition testimony (viewing the officers' asserted facts in the light most favorable to Plaintiff).

At this point in the footage, around the 4:09 time-elapsed mark in the video from Officer Conklin's body camera, Plaintiff is standing against his car, with his back to the open front door; both officers are standing between Plaintiff and the road.

Officer Conklin grabs Plaintiff's left wrist. With his right arm, Plaintiff gestures toward the gas station.

Plaintiff: "Can we go to over there?"

Officer Payne grabs Plaintiff's right arm.  Simultaneously, Plaintiff protests: "No, hey, do not detain me!"

Officer Conklin and Officer Payne both testified that, when they grabbed Plaintiff's wrists, he pulled away and began to physically resist them.  (Doc. 113-11 at 4 [Conklin: "So I put my hand on his wrist . . . to start handcuffing him. . . .  At that point, he jerks away.  I actually lose control of his arm because he jerks away from me."]; Doc. 113-10 at 4 [Payne: "As soon as we went hands on, . . . he immediately started pulling away from us and screaming."].)   Although blurry, the footage supports (and, at a minimum, no reasonable juror could find that it contradicts) these assertions.

Officer Conklin testified that, as a result of Plaintiff's resistance, Officer Conklin stumbled back; meanwhile, Plaintiff began struggling with Officer Payne.  (Doc. 113-11 at 4.)   The footage from Officer Conklin's camera supports (and at a minimum, no reasonable juror could find that it contradicts) this testimony: briefly, around the 4:12 mark, two shadows (presumably Officer Payne and Plaintiff) can be seen struggling:



Plaintiff shouts: "Do not detain me!"

According to Officer Conklin, Plaintiff then turned to face Officer Payne.  (Doc. 113-11 at 7 ["[H]e was facing Officer Payne, so I came—since I lost grip and I stumbled back."].)  The video footage from Officer Payne's camera shows Plaintiff facing him.  One of the officers can be heard saying, "You got him?"

According to Officer Payne, as the officers "continued to try to gain control," Plaintiff "kick[ed] directly backwards toward [Officer Payne]."  (Doc. 113-10 at 4.)  In the tentative ruling issued before oral argument, the Court stated that the video from Officer Payne's camera, although blurry, tends to support (and, at a minimum, does not contradict) this assertion because Plaintiff's foot appears to extend back toward Officer Payne.  During oral argument, Plaintiff's counsel took particular exception to this aspect of the tentative ruling, arguing that the video creates a jury question on whether any kicking attempt occurred.

The Court carefully re-reviewed the relevant video footage after oral argument and stands by the analysis in the tentative ruling.  Again, Defendants have come forward with competent evidence, in the form of Officer Payne's deposition testimony, to establish that Plaintiff attempted to kick Officer Payne during this portion of the encounter.  This was sufficient to meet Defendants' initial burden of production under Rule 56(c).  Meanwhile, in an effort to dispute Defendants' showing on this point, Plaintiff cites the body-cam footage.  But screengrabs from the relevant footage reveal the following.  Around the 4:21 mark in the footage from Officer Payne's camera, Plaintiff (who is on the left of the screen) has just spun around such that his back is facing Officer Payne:



Moments later, Plaintiff's right leg raises in the air and Plaintiff bends his knee, such that his heel is pointed toward Officer Payne:

Moments later, Plaintiff's heel moves quickly upward and in the direction of Officer Payne, causing it to blur in the footage:



Resolving the factual dispute over this point in Defendants' favor does not, as Plaintiff asserted during oral argument, usurp the role of the jury. No reasonable juror could view the video footage as evidence that Plaintiff did *not* attempt to kick Officer Payne. It either supports Officer Payne's sworn testimony on this point or is at worst inconclusive due to its blurriness. At most, then, Plaintiff has raised a "metaphysical doubt" as to the accuracy of Officer Payne's testimony, which is not enough under Rule 56. *Matsushita*, 475 U.S. at 586. *See also Baker*, 2022 WL 7033701 at *3 n.5 (D. Ariz. 2022) ("The mere fact that not every action is observable or clear from the video evidence is insufficient to create a genuine issue of material fact regarding Tevault's first-hand sworn testimony about what occurred.").[5]

At this point, Officer Conklin decided "to take [Plaintiff] down to the ground to control his movements." (Doc. 113-11 at 7.) He "grabbed onto [Plaintiff's] head and neck and brought [Plaintiff] to the ground." (*Id.* at 17.)[6] Officer Conklin did not give Plaintiff a verbal warning before the takedown. (Doc. 119-4 at 12-13.)[7]

After the takedown, at the 4:26 mark in the footage from Officer Payne's camera, Officer Payne can be heard saying, "He just tried to kick me in the nuts."

Next, the video footage shows both officers continuing their attempts to restrain Plaintiff. Officer Payne goes to the ground as well. (*See also* Doc. 113-10 at 5 [testifying that Officer Payne "also was down on the ground" at this point].) Plaintiff is screaming.

On the ground, the officers attempted to hold Plaintiff down. However, Officer Conklin testified that Plaintiff, who "still had control of his hands," "reached up to [Officer

---

[5] To the extent Plaintiff argues that the video doesn't show a kick to the *groin*, specifically (Doc. 119 at 6), the video and testimonial evidence is more ambiguous; thus, the Court will assume for purposes of summary judgment that the kick was not specifically aimed at Officer Payne's groin.

[6] Officer Conklin also describes the takedown as a "seatbelt hold," "with [his] right arm over between [Plaintiff's] neck and shoulder area and then [his] left arm between . . . [Plaintiff's] left arm and his body." (Doc. 113-10 at 7.) In his response, Plaintiff disputes the seatbelt hold characterization, emphasizing the language in the police report (which states "I immediately grabbed onto [Plaintiff's] head and neck and brought [Plaintiff] to the ground."). (Doc. 113-1 at 7-8.) Given the conflicting evidence, the Court adopts the version that is more favorable to Plaintiff as the nonmovant.

[7] The lack of warning is also supported by the video footage.

- 14 -

Conklin's] face and started trying to claw at . . . [his] face, towards [his] eye." (Doc. 113-11 at 8-9. *See also id.* at 9 [Q: "Did he leave marks on your face?" A: "No.· He was wearing gloves."].)[8] Officer Payne testified that, at some point, he gained control of Plaintiff's left wrist and attempted "to get it into a position that [the officers] could get [Plaintiff] physically detained in handcuffs" (Doc. 113-10 at 7) but was unsuccessful.

In the videos, Plaintiff continues screaming. His tone becomes more hysterical. Around the 4:30 mark in the video from Officer Conklin's camera, Plaintiff shouts, "I didn't do anything!" Around the 4:37 mark, Officer Conklin's camera shifts and a hand (presumably, Officer Conklin's) comes into view, holding an unidentified object. As Plaintiff continues to scream, one of the officers yells: "Stop!" In the upper-right corner of the video, Plaintiff's sleeve can be seen moving. Next, one of the officers' legs can be seen in the frame briefly. Officer Payne testified that, as the struggle continued, Officer Payne was trying to control Plaintiff's legs while Officer Conklin was trying "to gain control of [Plaintiff's] upper body." (Doc. 113-10 at 6.)

Officer Payne further testified that there was "a lot of jostling around" and Plaintiff "flail[ed] around and kick[ed] back" toward Officer Payne, pushing his body camera off. (*Id.* at 7. *See also id.* at 14 ["I know that my body cam was kicked off my chest."].) The footage from Officer Payne's body camera supports (and, at a minimum, no reasonable juror could conclude that it contradicts) Officer Payne's testimony on this point, as the footage shows Plaintiff struggling with the officers and, at the 4:43 mark, shows an unidentified object hit Officer Payne's camera with some force, causing the camera to fall to the ground. Officer Payne also testified that he "could feel [Plaintiff] grabbing things all around on [Officer Payne's] chest while [he] was trying to maintain control of [Plaintiff's] arm." (Doc. 113-10 at 12.)[9]

---

[8]     Plaintiff argues "the video disputes that Mr. Ames 'grabbed the left side of Officer Conklin's face, near the eye and cheek.'" (Doc. 119 at 6-7.) The Court disagrees. The footage is either too blurry or directed elsewhere during this portion of the encounter and thus neither corroborates nor contradicts Officer Conklin's testimony about Plaintiff clawing at his face. Thus, once again, the Court treats Defendants' evidence as undisputed. Fed. R. Civ. P. 56(e)(2).

[9]     In his response, Plaintiff argues that "the body cam video of Conklin and Payne also

While they were on the ground struggling, Officer Conklin "tried to attempt a carotid [hold]" on Plaintiff, "where you put pressure along the neck to where it causes him to lose consciousness," but Officer Conklin "couldn't wrap [his] arms in a position to where [he] could even apply it." (Doc. 113-11 at 12-14. *See also id.* at 17 [agreeing with the statement that Plaintiff was "moving his legs and arms violently and rapidly while [Officer Conklin] attempted several times to apply the carotid choke"].)[10]  When the carotid hold failed, Officer Conklin "broke free with [his] right arm and hand" and, because he was at "such . . . a weird angle and disadvantage," struck Plaintiff several times with the front of his first and second set of knuckles.  (*Id.* at 9, 19-20.)[11]

Officer Payne also testified that, at some point during the struggle on the ground, he "administered two focus[ed] blows to the right side of [Plaintiff's] torso area."  (Doc. 113-10 at 17.)[12]

In the video footage, Officer Payne and Plaintiff continue to struggle.  Officer Payne's camera is on the ground, facing upward, and the two men can be seen above it. Plaintiff can be heard screaming.  Around the 4:49 mark, Officer Payne appears to grasp Plaintiff's arm; a second later, Plaintiff yanks his arm free.

---

overwhelmingly disputes any violence on the part of [Plaintiff]."  (Doc. 119 at 6.  *See also id.* at 7 ["[T]he Officers' self-serving statements of [Plaintiff's] 'violent resistance' are disputed by the video itself."].)  Again, the Court disagrees.  The video footage, albeit blurry, indicates that Plaintiff was resisting the officers' attempts to restrain him but is inconclusive as to some of his specific actions (*i.e.*, whether he grabbed Officer Payne's vest).  At a minimum, no reasonable juror could conclude that the footage contradicts the officer's accounts of Plaintiff's specific acts of resistance.

[10]    The exact point that Officer Conklin began attempting a carotid hold is somewhat unclear.  (Doc. 113-11 at 12-13 [Q: "[D]id you ever [use] . . . an attempted carotid hold on [Plaintiff]?"  A: "I attempted."  Q: "What part of the video did you do that?"  A: "When we were down on the ground."  Q: "[I]f we replay the video to when you were down on the ground, can you stop it and tell us approximately when that happened?"  A: "It would be guessing. . . .  I have no way of knowing."].)

[11]    The attempted carotid hold and punches are not shown in the video footage but are undisputed.

[12]    These punches do not appear in the footage but are undisputed.

- 16 -





Officer Conklin testified that, at this point in the encounter, Officer Payne "said he was going to utilize his Taser." (Doc. 113-11 at 20.) However, this statement is not audible in the video footage and Officer Payne testified that he did not give a verbal warning before deploying his taser for the first time. (Doc. 119-6 at 12.) Thus, for summary judgment purposes, the Court assumes Officer Payne did not make this statement (at least in a way that Plaintiff could hear and understand).

According to Officer Conklin, once he understood that Officer Payne was planning to use a taser, he released Plaintiff and "got out of the way." (Doc. 113-11 at 10, 20. *See id.* at 10 ["I then tried to distance myself from [Plaintiff]."]) However, "as [Officer Conklin]

was standing up, [Plaintiff] was starting to sit up." (*Id.* at 10.)  Plaintiff "had his right hand back" and Officer Conklin felt "a tug" on his body.  (*Id.*)  Looking down, Officer Conklin saw Plaintiff's hand on Officer Conklin's gun.  (*Id.*)  Officer Conklin "was able to push [Plaintiff's] hand and arm away" and stand up.  (*Id.  See also id.* at 11 [clarifying that Plaintiff "reached for" but did not successfully "take" the gun].)  Because the video footage is either blurry or focused elsewhere, it neither corroborates nor contradicts Officer Conklin's testimony concerning the attempted gun grab.[13]

As Officer Conklin "stood completely up," Plaintiff "started to move . . . to get up." (*Id.* at 10.)  At the 4:57 mark in the footage from Officer Conklin's camera, the first taser deployment can be heard.  The taser log indicates that both charges were deployed simultaneously at 5:24:17 AM, each for five seconds.  (Doc. 113-6 at 2.)

Officer Payne testified that "when the Taser was initially deployed, [Plaintiff] was in an upright position and moving."  (Doc. 113-10 at 9.)  However, the first taser deployment "incapacitate[d] [Plaintiff] and [took] him down to the ground." (*Id.* at 8.)  At the 4:59 mark in the footage from Officer Conklin's camera, Plaintiff can be seen lying on the ground while the taser sound continues.  Plaintiff is screaming.

Officer Conklin testified that, after the first taser deployment, Plaintiff "was on the ground, on his stomach, propping himself up."  (Doc. 113-11 at 15.)  At the 5:02 mark in the footage from Officer Conklin's camera, Officer Payne's voice can be heard: "Stop moving!"

Plaintiff: "Alright!  I am sorry!"

Officer Payne: "Move again, you get hit again.  You understand?"

Plaintiff: "Alright!  I'm sorry, I'm sorry!"

At this point, the footage shows Plaintiff on his stomach on the ground with his hands by his head.  Officer Payne is standing over him, pointing a taser at him.  Taser charges are attached to Plaintiff.

---

[13]    Plaintiff disputes the gun grab in his motion papers (Doc. 119 at 7) but does not offer any evidence to contradict the officers' testimony.

1    Officer Payne testified, after the first taser deployment, Plaintiff was "still trying to
2    move around" as "he was down on the ground."  (Doc. 113-10 at 8.  *See also id.* at 9 ["He
3    remained down in [a prone] position but was not just, like, you know, laying still, not
4    moving in the prone position.·  He was still moving around."].)  Around the 5:04 mark in
5    the footage from Officer Conklin's camera, Plaintiff raises his head slightly off the
6    concrete:[14]



16   Thus, the video establishes that, at some point after the first taser deployment (but before
17   the second), Plaintiff propped himself up slightly.[15]  The video continues:

18         Plaintiff: "I'm sorry, I'm sorry!"

19         At this point, Officer Conklin's hands come into the camera frame, pointing a
20   second taser at Plaintiff.  His body camera shifts such that Plaintiff is no longer visible.
21   Officer Payne's body camera remains on the ground and is not pointing at the three men.
22   Around the 5:06 mark in the footage from Officer Conklin's camera, one of the officers
23   can be heard saying: "He reached for my gun."

24         Plaintiff: "I'm sorry!  I'm sorry!  Please don't do it!"

25   _____
26   [14]    This screen grab corroborates the officers' account and contradicts Plaintiff's
     counsel's assertion, in Plaintiff's response brief, that "nothing in the bodycam footage
27   establishes that Mr. Ames was looking back at the officers or attempting to prop himself
     up prior to their second use the taser."  (Doc. 119 at 8.)
28   [15]    Plaintiff disputes this fact in his response but does not provide any evidence to
     support his version of events.  (*Id.*)

1        One of the officers shouts: "Get your arms out!"

2        Plaintiff: "Please, stop."

3        Officer Payne: "Arms out and to the side!"

4        Plaintiff: "Stop, please.  Please can y'all stop.  I'm sorry!"

5        Officer Payne: "My thumb's all jammed up.

6        Plaintiff: "I'm sorry!  Please!"

7        Officer Conklin: "Don't move!"

8        Plaintiff: "Please!"

9        Officer Payne: "Get down on the ground now, arms out."

10       Plaintiff: "I won't flee.  I'm sorry."

11       Plaintiff remains outside the camera frame.  In the video footage from Officer

12  Conklin's camera, at the 5:27 mark, the sound of a second taser discharge can be heard.

13  This comports with the taser log, which shows a second deployment at 5:24:49 AM (*i.e.*,

14  32 seconds after the first), lasting one second.  (Doc. 113-6 at 2.)  Plaintiff screams.

15       Officer Payne: "Arms out!"

16       Plaintiff: "I'm sorry, I'm sorry!"

17       Officer Payne: "Fuck."

18       Officer Conklin's camera shifts slightly; Plaintiff's feet come into the camera frame.

19  Plaintiff is laying on his stomach.

20       Plaintiff: "Please!  Stop!  Stop!  Stop!"

21       Officer Conklin: "Don't move!  Don't you move!"

22       Plaintiff: "I'm sorry! Help!"

23       At the 5:45 mark, Officer Conklin briefly moves his hand out of the camera frame,

24  revealing most of Plaintiff's body.  Plaintiff is face down on the ground, with his hands by

25  his head.  Several taser charges are attached to him.  Several red laser beams are on him as

26  well.

27       …

28       …

1          C.      **Detainment**

2          The footage from Officer Conklin's camera shows a third officer, Officer Crowe,

3    arriving at the scene.

4          Plaintiff: "Help!  I'm sorry!  Stop!"

5          Plaintiff bends his knees so that his feet go into the air.  The top half of his body is

6    still out of the camera's frame.

7          Officer Payne: "Put your legs down!"

8          Plaintiff obeys the command.

9          Plaintiff: "Please, stop!  I'm sorry!  I have a two-year-old dau—"

10         Officer Conklin: "Don't you move!"

11         Plaintiff: "I love her, please!  I'm sorry!  I have a two-year-old daughter!  Please!"

12         As Officer Crowe approaches, Plaintiff can be seen in the footage from his body

13   camera, laying on his stomach, with his arms by his sides.  Plaintiff shifts his head slightly

14   to look at Officer Crowe but is otherwise still.

15         Officer Payne: "Stop moving!"

16         Plaintiff: "I'm sorry!"

17         Someone off-screen can be heard: "You guys good?"

18         Plaintiff: "Please, stop!  Everything checks out!  My ID is good!  I have insurance!

19   For the damage!  I'm sorry!"

20         Officer Crowe leans over Plaintiff, who continues to lay face down.

21         Officer Conklin:  "If you move, you'll get tased!  Do not tense up!"

22         Plaintiff: "I'm sorry, I'm sorry!"

23         At the 6:17 mark in Officer Conklin's video, a third taser sound can be heard.  A

24   second taser log indicates both charges were deployed simultaneously at 5:27:53 AM, each

25   for one second.  (Doc. 113-6 at 3.)  Officer Conklin testified that, as Officer Crowe tried to

26   secure Plaintiff, Officer Conklin saw Plaintiff's "legs moving, his arms tensing up . . . , and

27   then his right arm moving in a fashion as if he was trying to either take out the probes or

28   stand up."  (Doc. 113-11 at 12.)  Therefore, Officer Conklin "arced" his taser, but did not

use it on Plaintiff, "to show compliance." (Doc. 119-4 at 10.)[16]

Officer Conklin: "Do not tense up!"

Plaintiff: "I'm sorry!"

Officer Conklin: "Do not tense up!"

Plaintiff: "I'm not!  I'm sorry!"

Officer Crowe: "You guys got handcuffs?"

Officer Conklin tosses a set of handcuffs to the Officer Crowe, who then handcuffs Plaintiff.  Officers Payne and Conklin continue to stand with their tasers pointed at Plaintiff, charges attached to his body.

Plaintiff: "I'm sorry, I'm sorry, I'm sorry.  What did I do?  What did I do?  What did I do?  Ah!  I'm sorry!  Hey, what did I do?  What did I do?  What did I do?"

Around the 6:42 mark in the footage from Officer Conklin's camera, Officer Payne appears to look at his hand and then wince in pain.  For several more minutes, the conversation continues.  Plaintiff repeatedly asks what he had done, apologizes, yells "stop," and begs the officers not to beat him up.  The officers discuss whether Officer Conklin's radio was functioning.  Meanwhile, Officer Crowe checks Plaintiff's pockets. Before the video ends, at the 7:34 mark in the footage from Officer Conklin's camera and the 7:41 mark in the footage from Officer Payne's camera, Plaintiff can be heard off-camera: "They broke my nose!"

Officer Crowe: "Well, you broke an officer's arm, so—"

Plaintiff: "No, I didn't!"

Office Crowe: "Okay."

An off-camera voice: "I broke his nose."

As a result of the incident, Plaintiff suffered a broken nose[17] and various cuts and

---

[16]    The parties agree that "the third time . . . was only an arc and no electricity was sent to [Plaintiff's] body." (Doc. 119 at 9.)

[17]    As evidence of the broken nose, Plaintiff provides several photos of his face. (Doc. 119 at 9, citing Doc. 119-7 [booking photo] and Doc. 119-8 at 3 [photo of Plaintiff's face].) The broken nose is not apparent from either photo.  However, because Plaintiff is the nonmovant, the video suggests that one of the officers agreed that Plaintiff had suffered a broken nose, and Defendants do not object to this assertion, the Court assumes it is true.

bruises.  (Doc. 119-8 [photographs of injuries].)  Officer Payne suffered a thumb injury, although it is not clear that the injury was caused by Plaintiff's conduct, specifically (as opposed to the struggle in general).  (Doc. 119-6 at 11 [testifying that "the injury was sustained during the altercation" but that Officer Payne could not pinpoint when exactly the injury occurred or what specific event during the incident caused it].)

>    D.    **State Court Litigation**

Following the incident, Plaintiff was charged with two counts of aggravated assault on a law enforcement officer, in violation of A.R.S. § 13-1204(A)(8)(a).  (Doc. 113-1 at 14.)  Plaintiff later pleaded no contest to one count of resisting arrest, in violation of A.R.S. § 13-2508(A)(2).  (Doc. 113-8 [plea agreement]; Doc. 113-9 [minute entry from change of plea hearing].)  On June 8, 2022, Plaintiff was sentenced to 18 months of supervised probation.  (Doc. 113-12.)  In a declaration, Plaintiff avers: "Even though I pled no contest and was convicted of resisting arrest based upon that 'No Contest' plea, at all times I maintained, and continue to maintain, my innocence to that crime."  (Doc. 119-10 ¶ 4.)

II.    Procedural History

On October 30, 2020, Plaintiff initiated this action.  (Doc. 1.)

On January 12, 2021, Plaintiff filed a first amended complaint ("FAC").  (Doc. 9.)

On March 8, 2021, Defendants filed a partial motion to dismiss the FAC.  (Doc. 18.)  The same day, Defendants filed an answer to the FAC and counterclaim against Plaintiff.  (Doc. 19.)

On March 16, 2021, Defendants filed a motion to stay until the state-law criminal charges pending against Plaintiff were resolved.  (Doc. 23.)

On April 7, 2021, Defendants filed a first amended answer and counterclaim.  (Doc. 29.)

On May 7, 2021, the Court denied Defendants' stay request.  (Doc. 35.)

On July 19, 2021, Plaintiff filed a second amended complaint ("SAC").  (Doc. 47.)

On July 28, 2021, Defendants filed an answer to the SAC.  (Doc. 54.)

Also on July 28, 2021, Defendants filed a partial motion to dismiss the SAC.  (Doc.

55.)  On November 29, 2021, after a full briefing (Docs. 57, 58), the Court dismissed Counts Two and Three of the SAC (which were a *Monell* claim and a state-law battery claim) and granted Plaintiff's alternative request for leave to amend.  (Doc. 61.)

On December 13, 2021, Plaintiff filed a third amended complaint ("TAC").  (Doc. 64.)

On December 23, 2021, Defendants filed a partial answer to the TAC.  (Doc. 66.)

On June 15, 2022, Plaintiff requested leave to amend his pleading.  (Doc. 95.)  On July 14, 2022, Defendants filed a response opposing amendment.  (Doc. 103.)  On July 28, 2022, the Court granted Plaintiff's leave request.  (Doc. 107.)

On July 28, 2022, Plaintiff filed his operative pleading, the fourth amended complaint.  (Doc. 108.)  In Count One, Plaintiff asserts a claim under 42 U.S.C. § 1983, alleging that Officers Payne and Conklin violated his Fourth Amendment rights by using excessive force against him.  (Doc. 108 ¶¶ 29-37.)  In Count Two, Plaintiff asserts a *Monell* claim against the City, premised on three theories of municipal liability: (1) the existence of an unconstitutional policy, practice, or custom of using excessive force; (2) failure to train or supervise its officers on the proper use of force; and (3) ratification of the conduct of Officers Payne and Conklin.  (*Id.* ¶¶ 38-78.)

On August 4, 2022, Defendants answered the fourth amended complaint.  (Doc. 110.)  The same day, Defendants filed the pending motion for summary judgment.  (Doc. 113.)[18]  The motion is now fully briefed.  (Docs. 119, 126.)

On March 23, 2023, Plaintiff filed two notices of supplemental authorities.  (Docs. 129, 130.)

On March 24, 2023, the Court issued a tentative ruling.  (Doc. 132.)

On March 26, 2023, Plaintiff filed another notice of supplemental authorities.  (Doc. 133.)

On March 27, 2023, the Court heard oral argument.  (Doc. 134.)

---

[18]    Technically, the motion seeks partial summary judgment because it does not address the City's counterclaim.  However, the City represents that it will dismiss the counterclaim if the motion is granted.  (Doc. 113 at 1 n.1.)

**DISCUSSION**

I.   <u>Legal Standard</u>

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted). A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Id.* at 1102-03. But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to produce evidence to support its claim or defense. *Id.* at 1103. The nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita,* 475 U.S. at 587 (internal quotation marks and emphasis omitted); *see* Fed. R. Civ. P. 56(c)(1). There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986).  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (citations omitted).  At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."  *Id.* at 254.  Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant."  *Id.* at 255.

II.      The Parties' Arguments

Defendants move for summary judgment in their favor on both of Plaintiff's claims. (Doc. 113.)  First, Defendants argue that Officers Conklin and Payne are entitled to qualified immunity as to Count One.  (*Id.* at 8-14.)  Second, and alternatively, Defendants assert that, because Plaintiff's conviction under A.R.S. § 13-2508(A)(2) necessarily establishes that the officers used lawful force, Plaintiff's excessive force claim is barred by *Heck v. Humphrey*.  (*Id.* at 5-8.)  Third, Defendants argue that Plaintiff's *Monell* claim against the City in Count Two fails, either because Plaintiff's constitutional rights were not violated or because Plaintiff has not produced evidence supporting the claim.  (*Id.* at 14-23.)

In response, as for qualified immunity, Plaintiff argues that genuine issues of material fact exist regarding the reasonableness of the officers' use of force and that case law "clearly establish[s]" that the officers used unlawful force by tasing him multiple times while he was "unarmed, surrounded by Officers Payne and Conklin, and still on the ground recovering from the prior uses of force."  (Doc. 119 at 15-22.)  Next, Plaintiff provides three reasons why *Heck* should not apply: (1) his plea of no contest is not a conviction; (2) if it is a conviction, "in Arizona, a person can be convicted of resisting even an unlawful arrest" and thus his excessive force claim does not necessarily undermine his conviction; and (3) some of the alleged instances of excessive force did not occur during the arrest.  (*Id.* 10-15.)  Finally, as for his *Monell* claim against the City, Plaintiff contends

that deposition testimony from Police Commander Dane Sorensen, the City's representative, establishes that the City ratified Officers Conklin's and Payne's "unconstitutional actions" and, in a related vein, that the officers' actions were "part and parcel" of the City's "policy or custom." (*Id.* at 22-27.)

In reply, as for qualified immunity, Defendants reiterate that the officers' use of force was reasonable and contend that "Plaintiff has not demonstrated that the law clearly established that the force violated the Fourth Amendment." (Doc. 126 at 7-12.) Next, Defendants contend that, under Ninth Circuit law, a no-contest plea implicates *Heck*. (*Id.* at 5-6.) Defendants also challenge Plaintiff's "assertion that a person can be convicted under A.R.S. § 13-2508 for resisting an *unlawful* arrest," arguing that Arizona's resisting arrest statute applies only "if the arresting officer acted lawfully." (*Id.* at 1-4.) Next, Defendants contend that here, unlike in *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005), "[t]he video evidence indisputably demonstrates that the use of force was not 'distinct temporally or spatially from the factual basis for [Plaintiff's] conviction.'" (*Id.* at 4.) Finally, as for Count Two, Defendants reiterate that the officers "did not use unconstitutional excessive force" and argue that "Commander Sorensen's testimony cannot be evidence of ratification for several reasons": "Commander Sorensen is not the final policymaker for the City or the Tempe Police Department," "the alleged 'ratification' was obtained during Commander Sorensen's deposition, which cannot be used as evidence of ratification," and "Commander Sorensen's statement that the Officers were within policy is insufficient to support a claim of ratification." (*Id.* at 12-16.)

III.   Count One

A.   **Qualified Immunity**

Defendants contend that Officers Conklin and Payne are entitled to qualified immunity on Count One because (1) "they did not violate Plaintiff's constitutional rights"; and/or (2) "case law does not clearly establish that the Officers' use of force in these circumstances constitutes excessive force." (Doc. 113 at 8.)

"Qualified immunity shields federal and state officials from money damages unless

a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  Thus, "[w]hen an officer asserts qualified immunity as a defense, . . . [courts] first ask whether the facts taken in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right.  If so, [courts] then ask whether the right in question was clearly established at the time of the officer's actions, such that any reasonably well-trained officer would have known that his conduct was unlawful."  *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (citation omitted).  "Although [courts] must view the facts in the light most favorable to the nonmoving party, when considering qualified immunity, [courts] are also limited to considering what facts the officer could have known at the time of the incident."  *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017).

### 1. Excessive Force

Defendants argue that Officers Payne and Conklin did not violate the Fourth Amendment because their use of force were reasonable under the totality of the circumstances.  (Doc. 113 at 10-11.)

When the defense of qualified immunity is raised in a § 1983 action involving a claim of excessive force, the first prong of the qualified-immunity analysis requires an assessment of whether the force used was "objectively reasonable," which "is determined by an assessment of the totality of the circumstances."  *Green v. City & County of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014).  When evaluating the totality of the circumstances, courts must "balance the 'nature and quality of the intrusion' against the 'countervailing governmental interests at stake.'"  *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  "To assess the gravity of the government interests, [courts] have typically considered (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.  Where these interests do not support a need for force, *any* force used is constitutionally unreasonable." *Id.* (citations and internal

quotation marks omitted).   "Because this inquiry is inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases."  *Id.* (citation and internal quotation marks omitted).

The reasonableness of the use of force "must be judged from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.

Here, Plaintiff contends the officers used excessive force by (1) grabbing his arms and attempting to handcuff him "without any warning or provocation"; (2) taking him to the ground; (3) attempting a carotid hold several times; (4) punching him with "focused force blows"; and (5) tasing him twice.  (Doc. 119 at 2-8.)  Because the encounter between Plaintiff and the officers evolved over several minutes, it is helpful to break the encounter into three stages and evaluate the reasonableness of the officers' force during each stage.

a.   **First Stage**

The first stage occurred when the officers grabbed Plaintiff's wrists in an attempt to handcuff him.  Defendants argue this force was reasonable, noting that Plaintiff was "wandering the street in the early morning darkness with traffic passing him by," "admitted to the Officers that he engaged in 'dabbing,' that is, inhaling concentrated THC oil—then an illicit intoxicating substance," and was "babbling incessantly and refusing to comply with the Officers' commands."   (Doc. 113 at 11, footnote omitted.)   "After an approximately four-minute investigation, the Officers attempted to take Plaintiff into custody."  (*Id.  See also id.* at 3 ["At this moment, Officer Conklin began to arrest Plaintiff."].)

Plaintiff relies on the same evidence but characterizes the facts differently: "As Officer Conklin reached for [Plaintiff's] wrist without any warning, [Plaintiff] made a

request for them to go over to the gas station and pointed in that direction.  It was at that moment, without any warning or provocation, that Officers Payne and Conklin began to use force against [Plaintiff]."  (Doc. 119 at 5, citations omitted.)

The quantum of force used during the first stage was minimal.  Courts have found that handcuffing a suspect is a minimal use of force.  *See, e.g.*, *Jackson v. City of Bremerton*, 268 F.3d 646, 652 (9th Cir. 2001) ("normal handcuffing procedure" was a "minimal" intrusion); *Rose v. Fortuna Police Dep't*, 2018 WL 747011, *1 (N.D. Cal. 2018) ("[T]he minimal use of force Officer Erler exerted in handcuffing Mr. Rose was not excessive as a matter of law.").  Here, the officers simply made an *attempt* to handcuff Plaintiff, which was unsuccessful because Plaintiff moved after the officers attempted to grab his arms.  The video shows that the initial grabbing attempt occurred in a normal, nonaggressive manner and Plaintiff does not provide any evidence or argument to the contrary.  (*See generally* Doc. 119.)

Turning to the *Graham* factors, the video footage establishes that Plaintiff was standing in the middle of a roadway as cars drove by, ignored the officers' suggestions that he move out of the roadway, told the officers (several times) that he had used marijuana earlier in the evening, expressed the desire to leave, stated "No, I'm not detained" when the officers told him he should consider himself detained, and then began to turn away from the officers.  Even accepting that Plaintiff did not pose an immediate threat to the officers' safety and was not physically resisting at this point (and that the officers' retention of his identification card might have lessened his flight risk to some extent), the officers had the right to use some force in the course of attempting to handcuff Plaintiff.  *Graham*, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.").

The parties dispute whether the handcuffing effort constituted an attempt to *arrest* Plaintiff or was simply an effort to *detain* Plaintiff during the pendency of an investigatory stop.  (Doc. 113 at 3 & n.3 [Defendants' contention that it was an arrest]; Doc. 119 at 5

[Plaintiff's contention that it was a detainment].)   To the extent it was an arrest, any excessive force claim would be a non-starter—the officers had probable cause to believe that Plaintiff had violated any number of laws (including, by his own admission, the drug laws) and Ninth Circuit law is clear that officers do not engage in excessive force by handcuffing an arrestee during the arrest sequence.   *See, e.g., Demarest v. City of Vallejo, Cal.*, 44 F.4th 1209, 1226 (9th Cir. 2022) ("[E]ven assuming that Demarest did not actively resist and did not present an immediate security threat to Officer Brown, she nonetheless could properly use a reasonable degree of force to take him into custody.   Although Demarest argues that Officer Brown should have instructed him to step out of the car rather than physically remove him from the car by grabbing his arm, her actions were reasonable given Demarest's lack of cooperation with her commands up to that point and the modest nature of the force used."); *Shafer v. City of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) ("Shafer's primary argument on appeal is that Deputy Padilla . . . had no basis for using any force whatsoever.   We disagree. . . .   Deputy Padilla had probable cause to arrest Shafer for violations of [the] California Penal Code . . . [which] entitled Deputy Padilla to use some degree of force.").   Indeed, the Ninth Circuit has suggested that an officer's failure to make a routine handcuffing attempt during the initial stages of an arrest sequence, and instead to proceed directly to more intrusive forms of force, may be an indication of unreasonableness.   *Blankenhorn v. City of Orange*, 485 F.3d 463, 478-79 (9th Cir. 2007) (concluding that the officers' use of force, which involved gang-tackling a non-violent suspect where the only alleged crime was misdemeanor trespass, was excessive in part because they "never tried to handcuff [the plaintiff] . . . before [they] gang-tackled him").

But even assuming the handcuffing attempt was part of an effort to detain Plaintiff during an investigatory stop, it constituted an objectively reasonable use of force.   To be sure, "handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop." *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982).   Thus, "using handcuffs . . . is unreasonable in many situations involving investigatory or *Terry* stops." *Green*, 751 F.3d at 1050 (citations and

internal quotation marks omitted).  Nevertheless, the use of handcuffs during a *Terry* stop is not always unreasonable and may be justified if, for example, the suspect poses a threat to the officers or others or attempts to leave before the investigatory stop has run its course.  *See, e.g., Bautista*, 684 F.2d at 1289 (citing, with approval, a D.C. Circuit opinion in which "handcuffing of [the] suspect [was] permissible because the suspect 'turned and pulled away' when the police officer placed an arm on him"); *United States v. Hensley*, 469 U.S. 221, 235 (1985) (an officer conducting a *Terry* stop is "authorized to take such steps as [are] reasonably necessary . . . to maintain the status quo during the course of the stop"); *United States v. Haye*, 825 F.2d 32, 35 (4th Cir. 1987) ("By its very nature, . . . a *Terry* stop is involuntary, and the suspect is not free to avoid it by flight.  To that extent, his freedom is limited, and the policeman is authorized to use such reasonable force as may be necessary to accomplish the purpose of the limited stop.").  Here, the officers' testimony and the video footage establishes that both of these considerations were present—at the time of the handcuffing attempt, Plaintiff was walking around in the middle of a busy roadway while on drugs (thereby creating a danger to others) and, separately, had expressed a desire to leave and had just pointedly disagreed with the officers' assertion that he should consider himself detained (thereby creating a reasonable concern about flight).  It was objectively reasonable under these circumstances for the officers to take the minimally intrusive step of grabbing Plaintiff's wrists so as to begin to handcuff him.  *Cf. Glass v. Robinson*, 2022 WL 252395, *4 (D. Ariz. 2022) (concluding that the officer "grabbing [the plaintiff's] arm to put her into handcuffs was not an unreasonable method to prevent a suspect from leaving during a *Terry* stop" where "[t]he body-cam video establishes that Glass was drunk and attempting to escape the police officers").

### b.    **Second Stage**

The second stage began when Plaintiff pulled away, resisting the officers' attempt to handcuff him.  It is undisputed that Defendants responded by employing more intrusive forms of force.  The record evidence, viewed in the light most favorable to Plaintiff, shows the following sequence.

When Plaintiff attempted to pull his arms free, Officer Conklin lost his grip and stumbled back; meanwhile, Plaintiff turned to face Officer Payne.  After Plaintiff said "Do not detain me" and continued to struggle with Officer Payne, which included an attempt to kick Officer Payne (although it is unclear whether Officer Conklin was immediately aware of the kick), Officer Conklin used a more intrusive form of force, "grabb[ing] onto [Plaintiff's] head and neck" to bring him to the ground.  (Doc. 131-11 at 17.)  On the ground, both officers attempted to hold Plaintiff down and handcuff him.  After Plaintiff tried to claw at Officer Conklin's face and failed to heed commands to "Stop!", Officer Conklin tried to "cause[] [Plaintiff] to lose consciousness" by applying pressure along his neck (*i.e.*, employing a "carotid hold") and, when that was unsuccessful, punched Plaintiff several times in the face with a closed fist.  (*Id.* at 14, 18-20.)  After Plaintiff continued to physically resist detainment (including by grabbing Officer Payne's vest and kicking his body camera off), Officer Payne punched Plaintiff twice in the torso with a closed fist. (Doc. 113-10 at 7, 10-12, 17.)

Defendants contend that "the type and amount of force [employed by Officers Payne and Conklin] was dictated by Plaintiff's actions and was reasonable."  (Doc. 113 at 11.)  As for the *Graham* factors, Defendants note that "the Officers had reason to believe that Plaintiff caused a motor vehicle accident while intoxicated by THC oil and posed a threat to the public if he was permitted to get back into his car and drive away," "when the Officers first appeared on the scene, Plaintiff was wandering around in a traffic-filled road in the early morning darkness posing a threat to all drivers (as well as himself)," and "[b]y actively and violently resisting arresting, Plaintiff proved to be a danger to the Officers and the public at large."  (*Id.* at 12.  *See also id.* ["[E]ach type of force used was necessary to bring Plaintiff under control."].)

In response, Plaintiff purports to dispute a number of the facts summarized above.  (*See, e.g.*, Doc. 119 at 7 ["[Plaintiff] never once kicked (or attempted to) an officer, grabbed (or attempted to) at an officers eye and cheek, [or] attacked (or attempted to) the police officers while lying on his back . . . ."].)  As the non-movant, Plaintiff's factual assertions,

*if supported*, would be assumed true.  However, as discussed at length elsewhere in this order, Plaintiff provides no competent *evidence* to support his version of the facts or to rebut the officers' deposition testimony.  "Mere allegation and speculation do not create a factual dispute for purposes of summary judgment."  *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) (citation omitted).

At any rate, as for reasonableness, Plaintiff contends the amount of force used during the second stage was "well above an intermediate level of force, and such a serious intrusion cannot be justified under the circumstances."  (Doc. 119 at 16.)  "Not only did Officers Payne and Conklin go 'hand-on' but they also brutally attacked [Plaintiff] attempting to use the Carotid chokehold, multiple punches to his face and torso . . . without warning or any verbal commands to comply."  (*Id.*)

Based on the officers' testimony, as well as the evidence of Plaintiff's injuries, the Court concludes that the force used during the second stage of the incident was at times intermediate.  *Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012) (kicking and baton blows to the plaintiff before he was handcuffed involved "intermediate force" that presented "a significant intrusion"); *Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012) ("We have recognized that 'physical blows or cuts' often constitute a more substantial application of force than categories of force that do not involve a physical impact to the body.").  However, because Plaintiff engaged in active physical resistance in response to the officers' attempt to handcuff him, the officers were entitled to use increased force to protect themselves and complete the detainment.

More specifically, as for the takedown, Defendants' proffered evidence establishes that Officer Conklin's use of force was reasonable.  Although taking Plaintiff to the ground was an escalation in the level of force, the countervailing government interests had increased as well.  In his deposition, Officer Conklin testified that "due to being on South Rural Road and it now becoming a struggle, I decided to attempt . . . to take him down to the ground to control his movements."  (Doc. 113-11 at 6.)  In the video footage, Plaintiff can be heard shouting "Do not detain me!"  By this point, Plaintiff had successfully broken

free from Officer Conklin's grasp, turned to face Officer Payne, and was actively resisting detainment, which resistance included an attempt to kick Officer Payne. "[T]he Fourth Amendment permits police officers to use some force to overcome resistance to being arrested." *Blankenhorn*, 485 F.3d at 479.[19]  Additionally, as with the first stage, Plaintiff remained in the middle of the street next to his car and had given the officers reasons to believe he was intoxicated (and thus should not drive or be allowed to wander in traffic). Thus, the record reflects that Officer Conklin had objective reasons to believe that Plaintiff posed an immediate safety threat—*i.e.*, the "most important" *Graham* factor.  *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).  Accordingly, on the undisputed facts, a reasonable jury could not conclude the takedown was excessive.[20]  *See also Garcia v. City of Santa Clara*, 772 F. App'x 470, 472 (9th Cir. 2019) (the force used, "which included a leg sweep, control holds, and a punch to the face, was reasonable" to control suspect who "resisted arrest and attempted to punch and kick the officers while the officers were trying to subdue him"); *Bennett v. Gow*, 345 F. App'x 286, 287 (9th Cir. 2009) ("[A]lthough the crime was relatively minor, Bennett turned the encounter from bad to worse by refusing Officer's Gow's instructions to hand him the license and by walking away despite the officer's instructions to stop.  Bennett also twisted away when Officer Gow began to handcuff him.  Officer Gow then pushed Bennett to the ground using relatively minor force

---

[19]     Additionally, it is not clear from the video and testimonial evidence that the takedown itself constituted more than minimal force.  *See, e.g.*, *Sandoval v. Officer Melvin of Winston Police Dep't*, 2021 WL 920858, *6 (D. Or. 2021), *aff'd sub nom. Sandoval v. Melvin*, 2022 WL 883744 (9th Cir. 2022) (concluding the severity of the intrusion was "minimal" where the officer "grabbed [the plaintiff] while she stood atop two steps at the doorway entrance, took her 'down to the ground hard and fast,' and put a knee in her back" but did not use "additional force, such as kicks or punches").

[20]     This conclusion is supported by the fact that "tackling is typically considered a low quantum of force."  *Beech v. City of Stockton*, 2021 WL 4429455, *6 (E.D. Cal. 2021). *See also Sandoval v. Officer Melvin of Winston Police Dep't*, 2021 WL 920858, *6 (D. Or. 2021), *aff'd sub nom. Sandoval v. Melvin*, 2022 WL 883744 (9th Cir. 2022) (concluding the severity of the intrusion was "minimal" where the officer "grabbed [the plaintiff] while she stood atop two steps at the doorway entrance, took her 'down to the ground hard and fast,' and put a knee in her back" but did not use "additional force, such as kicks or punches").  Nevertheless, because Plaintiff presented evidence of a broken nose, the Court assumes for summary judgment purposes that the force used in taking Plaintiff to the ground was more than minimal.  *See also id.* (noting that "the presence of significant injuries from a takedown may suggest the magnitude of the force used").

and finished handcuffing him.  Although certainly uncomfortable and unpleasant, the take-down was not an objectively unreasonable use of force."); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921-22 (9th Cir. 2001) (rejecting excessive force claim where the officer "attempted to handcuff" the plaintiff for committing a suspected misdemeanor offense, the plaintiff responded by "stiffen[ing] her arm and attempt[ing] to pull free," and the officer responded by "twisting [the plaintiff's] left arm behind her with enough force to lift her off the ground and break her watch band," because once the plaintiff "failed to cooperate and stiffened her arm when being handcuffed," the officer was justified in "us[ing] additional force").

Likewise, after Plaintiff continued to resist and fight back (including by "clawing" at Officer Conklin's face), Officer Conklin was justified in attempting a carotid hold and, when that failed, punching Plaintiff in the face.  As an initial matter, although Plaintiff emphasizes the potential severity of the carotid hold (Doc. 119 at 16), it is not clear that Officer Conklin's *attempts* to employ the restraint are equal in force to the successful use of a carotid hold, which "may constitute a significant use of force and threatens serious injury when applied multiple times." *Rascon v. Brookins*, 2018 WL 783675, *10 (D. Ariz. 2018).[21]  *Compare Sorgen v. City & Cnty. of San Francisco*, 2006 WL 2583683, *7 (N.D. Cal. 2006) ("While a baton clearly has the potential to inflict very substantial injuries Oliver did not use it in this manner here.  Rather, he used the baton in a manner that only caused temporary bruises and no serious injury.  As such, the Court concludes that this modest escalation of force was not excessive given the tense situation and Sorgen's refusal to comply with Oliver's commands to move back even after being physically pushed to do so.").  Nevertheless, even assuming the unsuccessful carotid hold was a significant escalation in the level of force, the undisputed evidence demonstrates that Officer Conklin

---

[21]     Officer Conklin testified that although he attempted the hold more than once, he was unable to "wrap [his] arms in a position to where [he] could even apply [the pressure]" to Plaintiff's neck.  (Doc. 119-4 at 10.)  The video supports (and, at a minimum, no reasonable juror could conclude that it contradicts) this testimony in that there is no point during the ground struggle at which Plaintiff appears to lose consciousness (or even to stop actively resisting).

had objective reasons to believe Plaintiff was a threat to the officers' safety and the safety of others.  Only two officers were present at the scene, Plaintiff remained in the middle of the road (as did his car), Plaintiff had already attempted to kick Office Payne, and the officers' attempts to restrain Plaintiff using lesser forms of force had failed.

Likewise, as for the fist strikes, Officer Conklin threw the punches in the heat of an unpredictable and tense encounter, when Plaintiff was actively resisting the officers' handcuffing attempts, and after Plaintiff had increased the severity of the threat by first attempting to kick Officer Payne and then attempting to grab and claw Officer Conklin's face.  Thus, no reasonable juror could agree with Plaintiff's description of this portion of the encounter as a "brutal[] attack[]" (Doc. 119 at 16)—instead, the undisputed evidence demonstrates that the officers increased the level of force as Plaintiff escalated the situation.  On this record, given the safety threat and Plaintiff's continued resistance, a reasonable jury could not find that Officer Conklin acted unreasonably by employing more significant forms of force to subdue Plaintiff.  *See also Armenta v. City of Goodyear*, 607 F. Supp. 3d 934, 940 (D. Ariz. 2022) ("During the struggle, Armenta expends significant effort in trying to break free from Ross's hold.  Once Armenta began actively resisting, Ross had little choice but to use some amount of force.  Given Armenta's active resistance, the government interest in the use of force was substantial."); *Gordon v. City & Cnty. of San Francisco*, 2021 WL 5449074, *9 (N.D. Cal. 2021) ("At that point, Pacchetti had informed Gordon he was under arrest, and Gordon had nevertheless jerked his hands away from Pacchetti, raised them towards his chest, and tried to struggle away from him. Pacchetti had also been briefed on Gordon's history of violently resisting arrest.  No reasonable jury could find Pacchetti's decision to punch Gordon when he resisted arrest was unreasonable under the Fourth Amendment.") (citations omitted).  *See generally Blankenhorn*, 485 F.3d at 477 ("Neither tackling nor punching a suspect to make an arrest necessarily constitutes excessive force.").

For the same reasons, after Plaintiff continued to resist arrest, grabbing at Officer Payne's vest and kicking Officer Payne's body camera off, Officer Payne acted reasonably

by striking Plaintiff in the torso, several times, with a closed fist.  Based on the undisputed evidence, it was reasonable for Officer Payne to conclude that punches were necessary to counteract the immediate threat to the officers' safety and the fact Plaintiff was actively resisting arrest.  *See also Armenta*, 607 F. Supp. 3d at 939-40 ("Ross punched Armenta a single time in her head while struggling with her. . . .  At the very least, the video shows the punch was not administered to a non-resisting individual simply to inflict harm. . . .  Armenta's physical resistance created a substantial governmental interest in the use of some force.  Armenta's actions put Ross in the position of choosing between using force against her or simply allowing her to reenter her car.  It was not unreasonable for Ross to use some amount of force to prevent Armenta from entering her car or reaching into her car. . . .  Viewed in the light most favorable to Armenta, the balance of interests does not establish the punching and dragging were objectively unreasonable.").

        As with the first stage, Plaintiff contends that "[a]t the very least, a genuine issue of material fact exists regarding the Defendant Officers' use of force because both Officers admitted that [Plaintiff] posed no immediate or significant risk to them or the public." (Doc. 119 at 18.)  However, the Court agrees with Defendants (Doc. 126 at 9) that this is a mischaracterization of the officers' testimony.  Officer Conklin testified that Plaintiff did not act violently or aggressively *before* they attempted to grab his wrists.  (Doc. 119-4 at 14.)  In contrast, both officers testified that they viewed Plaintiff as a significant threat to their safety *after* the struggle began.  (*See, e.g.*, Doc. 113-11 at 20 [Conklin: "I was in a state of panic because he was about to claw my eye out . . . ."]; Doc. 113-10 at 5-6 [Payne: "He had just tried to kick me in the groin, and I believe at that point, I might have lost control of the arm."].)  Given the absence of conflicting evidence, the Court considers these facts undisputed.  *See also Arpin*, 261 F.3d at 922 ("Arpin does not set forth any specific facts disputing Officer Stone's version of events.  Aside from Arpin's conclusory statement that she 'did not resist arrest in any way,' Arpin does not refute Officer Stone's report that she stiffened her arm and attempted to pull it away, which was impermissible regardless of whether Officer Stone had probable cause to arrest her.  Arpin's conclusory allegations

unsupported by factual data are insufficient to defeat the County Defendants' summary judgment motion.").

Finally, the absence of verbal warnings does not change the conclusion here. "Whether an officer warned a suspect that failure to comply with the officer's commands would result in the use of force is another relevant factor in an excessive force analysis" but is not dispositive. *S.R. Nehad v. Browder*, 929 F.3d 1125, 1137 (9th Cir. 2019). *See also id.* ("The seemingly obvious principle that police should, if possible, give warnings prior to using force is not novel, and is well known to law enforcement officers"); *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001) ("We do not hold, however, that warnings are required whenever less than deadly force is employed. Rather, we simply determine that such warnings should be given, when feasible, if the use of force may result in serious injury, and that the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test."). Here, the entire second stage of the interaction lasted less than a minute. Plaintiff was screaming for most of that time and did not stop screaming when the officers yelled "Stop, stop!" *Compare Deorle*, 272 F.3d at 1284 ("In the present case, the desirability and feasibility of a warning are obvious. . . . There was ample time to give that order or warning and no reason whatsoever not to do so."). Under these circumstances, a reasonable jury could not find that the officers' use of force during the second stage violated the Fourth Amendment.

### C.      **Third Stage**

The third stage included two taser strikes. The relevant sequence, viewed in the light most favorable to Plaintiff, is as follows: (1) Officer Payne attempted to grasp Plaintiff's arm, only for Plaintiff to yank his arm free; (2) Officer Conklin attempted to release Plaintiff and step out of the way; (3) as Officer Conklin rose to his feet, Plaintiff grabbed at Officer Conklin's gun but Officer Conklin pushed him away; (4) Plaintiff stood up and Officer Payne deployed his taser, which hit Plaintiff in the back, for five seconds; (4) after falling to the ground, incapacitated, Plaintiff continued to lay on his stomach but propped his head up; (5) about 30 seconds after the first deployment, and after the officers

told Plaintiff to "stop moving" but Plaintiff continued moving while on the ground, Officer Payne deployed his taser for a second time, for one second.

Defendants argue that the taser strikes were a reasonable use of force. Because "Plaintiff was still not under control," "[t]he Officers moved to a safe position to deploy a taser, and Plaintiff stood up and attempted to get away from the Officers. Officer Payne then discharged both taser cartridges. This was effective and brought Plaintiff to the ground." (Doc. 113 at 12.) "Plaintiff did not follow instructions to stay on the ground and not move and attempted to get up. Officer Payne discharged his taser again for one second." (*Id.*)

Relying on the same evidence (*i.e.*, the videos and the officers' testimony), Plaintiff attempts to create a different narrative, arguing that he was "on the ground" when Officer Payne, without warning, deployed the taser for the first time. (Doc. 119 at 8.) "After being Tased without warning [Plaintiff] was lying prone on the asphalt screaming he was sorry and begging for help. [Plaintiff] was tased a second time, in under a minute, while lying on his stomach on the asphalt recovering from the brutal beating and tasing. . . . [N]othing in the bodycam footage establishes that [Plaintiff] was looking back at the officers or attempting to prop himself up prior to their second use the taser." (*Id.*)

First, as discussed, Plaintiff is mistaken in his assertion that "the video clearly shows that [Plaintiff] was . . . never seen in an upright position until after the Officers handcuffed him." (Doc. 119 at 8.) At both the 4:49 mark in the footage from Officer Payne's camera and the 4:56 mark in the footage from Officer Conklin's camera, Plaintiff appears upright. Plaintiff is also incorrect that "nothing in the bodycam footage establishes that [Plaintiff] was looking back at the officers or attempting to prop himself up prior to their second use the taser" (*id.*). Around the 5:04 mark in the footage from Officer Conklin's camera, Plaintiff can be seen raising his head and shoulders off the sidewalk. Finally, to the extent Plaintiff asserts that he was not moving during the portions of the incident *not* visible in the video footage, the trouble is (again) that he provides no competent evidence to support his version of events.

Turning to the *Graham* analysis, the Ninth Circuit has recognized that tasers deliver a "painful and frightening blow" and "constitute an intermediate or medium, though not insignificant, quantum of force." *Bryan*, 630 F.3d at 826. *See also Thomas v. Dillard*, 818 F.3d 864, 890 (9th Cir. 2016), *as amended* (2016) ("Using a Taser in dart mode constitutes an 'intermediate, significant level of force.'").   However, the Ninth Circuit has also recognized that tasers can play an "important role . . . in law enforcement" because "[t]he ability to defuse a dangerous situation from a distance can obviate the need for more severe, or even deadly, force and thus can help protect police officers, bystanders, and suspects alike."   *Bryan*, 630 F.3d at 826.   Thus, the "most important" factor in evaluating the reasonableness of the use of a taser "is whether the suspect posed an immediate threat to the safety of the officers or others."   *Id.* (internal citation and quotation marks omitted). *See also id.* ("A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury.  Rather, the objective facts must indicate that the suspect poses an immediate threat to the officer or a member of the public.") (internal citation and quotation marks omitted).   Here, when Officer Payne deployed his taser for the first time, the *Graham* factors supported the application of not-insignificant levels of force against Plaintiff.   The record establishes that Plaintiff was actively struggling with the officers, attempting to get up, and had successfully resisted several less-intrusive attempts to detain him.   This was a chaotic scene and the officers had several reasons to believe that Plaintiff posed an immediate threat to their safety—he had just managed to yank himself away, prevented Officer Conklin from employing a carotid hold, kicked at Officer Payne, and clawed at Officer Conklin's face.   At that point, only two officers were present at the scene and Officer Payne had injured his thumb.   Also, Plaintiff had just attempted to grab Officer Conklin's gun (although it is unclear whether Officer Payne was subjectively aware of this particular aspect of Plaintiff's conduct).   Further, Plaintiff was only a few feet away from the officers when Officer Payne deployed the taser (not to mention, still in the middle of the road, next to his car).   Ninth Circuit cases support the use of a taser in such

circumstances. *See, e.g.*, *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130 (9th Cir. 2017) ("Despite Jones's large size and the fact that he had run away from a traffic stop, he had neither threatened Hatten nor committed a serious offense, and he didn't appear to have a weapon. Based on these facts, Hatten believed that something less than deadly force was justified, so he used his taser to subdue Jones. This decision was consistent with our case law, as we've held that use of tasers can be intermediate force. Using a taser to stop Jones and place him under arrest was reasonable under the circumstances."); *Beaver v. City of Fed. Way*, 301 F. App'x 704, 705 (9th Cir. 2008) (tasing an arrestee who was suspected of committing a daytime burglary was not excessive where the arrestee was attempting to flee, ignoring commands, and remained non-compliant). *See also A.B. v. Cnty. of San Diego*, 2020 WL 5847551, *14 (S.D. Cal. 2020), *aff'd*, 2022 WL 1055558 (9th Cir. 2022) (the fact that the taser deployment was "reactive and intended to subdue" weighed in favor of summary judgment on excessive force claim). *Compare Bryan*, 630 F.3d at 822 (taser use was excessive force where the suspect was "standing twenty to twenty-five feet away and not attempting to flee").

The analysis is similar in relation to the second taser deployment.[22] The video demonstrates that Plaintiff raised his head and shoulders off the pavement at one point and Officer Conklin testified (without contradiction by Plaintiff or the video) that Plaintiff disobeyed the officers' commands to stop moving. Given those circumstances, coupled with the undisputed facts that the second taser deployment lasted only one second,[23] only two officers were present at the scene, and Plaintiff had demonstrated a significant ability to resist the officers' attempts to restrain him using less-intrusive forms of force, a reasonable jury could not conclude that the second taser strike constituted excessive force. This conclusion is supported by circumstantial evidence suggesting Plaintiff was still

---

[22]     Plaintiff emphasizes the danger of multiple taser strikes, noting that in several Ninth Circuit cases, the fact that a taser was used multiple times necessarily raised the quantum of force. (Doc. 119 at 17.) But as discussed *infra*, in relation to the second prong of the qualified-immunity analysis, Plaintiff's cited cases are easily distinguishable.

[23]     Plaintiff does not identify, nor can this Court find, a case holding that a one-second taser cycle was constitutionally excessive.

moving around to some extent (*i.e.*, the audio from the body cameras, which shows the officers repeatedly telling Plaintiff to stop moving) and that Officer Payne learned, during the 30 seconds between the first and second deployments, that Plaintiff had reached for Officer Conklin's gun during the struggle.[24]  Given the difficulty in subduing Plaintiff and the fact that backup had not yet arrived, it was objectively reasonable for Officer Payne to believe it was necessary to use a quick taser cycle (lasting only one second) to prevent Plaintiff from rising again.  And given the repeated physical resistance by Plaintiff before Officer Payne used his taser, it was objectively reasonable for Officer Payne to view Plaintiff's movements while on the ground, even if minimal, as a sign Plaintiff might attempt to resist further or flee.

### 2.   Clearly Established Right

Officers Payne and Conklin are also entitled to summary judgment under the second prong of the qualified-immunity analysis.

A government official's conduct violates "clearly established" law when "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Ashcroft*, 563 U.S. at 741 (cleaned up).  Although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*  "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).  *See also id.* ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (citation and internal quotation marks omitted); *Sharp v. Cnty. of Orange*, 871 F.3d 901, 910-11 (9th Cir. 2017) ("The Supreme Court has repeatedly instructed that we examine whether the violative nature of particular conduct is clearly established by controlling precedent, not whether the conduct violates a general principle of law. . . .  Except in the rare case of an 'obvious' instance of constitutional misconduct

---

[24]     Even assuming Plaintiff did not in fact do so, the video footage demonstrates that Officer Payne had reason to believe this occurred.

. . . , Plaintiffs must identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.  In other words, Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert these [defendants] in this case that their particular conduct was unlawful.") (cleaned up). Additionally, "the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Id.* at 911 (citation omitted).  *See also Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) ("The right must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority.").

Here, Plaintiff generally emphasizes that "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  (Doc. 119 at 21, citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).)  The Supreme Court has repeatedly and recently stressed, however, that the "clearly established" standard requires a high degree of specificity, particularly in excessive force cases.  *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) ("Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.") (citation omitted).  Although a narrow exception may exist "in a sufficiently 'obvious' case of constitutional misconduct," "the bar for finding such obviousness is quite high."  *Shafer*, 868 F.3d at 1118 n.3.  Plaintiff does not explain why the narrow exception applies here and the Court does not find the alleged constitutional violations in this case to be sufficiently obvious to invoke it.

As for the specific facts at issue here, Plaintiff does not identify any case discussing takedowns, carotid holds, or closed-fist punches.  (*See generally* Doc. 119.)[25]  Nor does

---

[25]     In a supplemental notice of authority filed the day before oral argument, Plaintiff cited *Glazer v. City of Long Beach*, 201 F. Supp. 2d 1131 (C.D. Cal. 2000), and during oral argument, Plaintiff's counsel identified *Glazer* as a case involving a claim of excessive force arising from a carotid hold.  But *Glazer* fails, for a host of reasons, to qualify as the sort of clearly established law that could overcome Defendants' qualified-immunity defense—not only is it a single district court decision (and thus does not qualify as a

Plaintiff identify any case holding that it is impermissible to attempt to use handcuffs during a *Terry* stop in which the suspect is walking around, apparently high on drugs, on a busy roadway, has expressed a desire to leave, and has just disagreed with the officers' contention that should consider himself detained.  "Once the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.'"  *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000).  *See also Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.").  Accordingly, as to those uses of force (*i.e.*, the first and second stages of the encounter), Plaintiff has not demonstrated that the rights allegedly violated were clearly established.

As for the taser strikes, despite remarking that "the case law provides significant guidance on the use of tasers," Plaintiff points to only two cases: *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123 (9th Cir. 2017), and *Mattos v. Agarano*, 661 F.3d 433, 446 (9th Cir. 2011).  (Doc. 119 at 21-22.)  But these cases are too factually dissimilar to have provided fair notice to the officers.

In *Jones*, the Ninth Circuit held that the officer's initial use of a taser to subdue an unarmed suspect who had fled from a traffic stop was reasonable.  873 F.3d at 1130.  "As the situation evolved, however, the justification for the use of force waned."  *Id.*  As Jones was being handcuffed, and after multiple other officers had arrived at the scene, two officers continued to repeatedly apply their tasers, sometimes simultaneously, for periods longer than five seconds.  *Id.* at 1130-31.  The court emphasized that "by the time Jones was prone and surrounded by multiple officers, there would have been no continuing justification for using intermediate force: Jones was on the ground after his body 'locked

---

controlling authority or a robust consensus of cases of persuasive authority), but there the plaintiff put forth competent, admissible evidence "that he never resisted [the officer's] efforts to arrest him and that any movement of his arms were purely reflexive in response to [the officer's] sudden move to grab him."  *Id.* at 1137.  The facts here are different—as discussed throughout this order, Defendants' proffered evidence establishes that Plaintiff engaged in various forms of resistance, and Plaintiff has failed to put forth competent evidence to create a genuine dispute of fact on that point.

up' as a result of repeated taser shocks; he had no weapon and was making no threatening sounds or gestures."   *Id.*   In *Mattos*, the officers tased a pregnant woman (who had committed only minor offenses) three times over the course of a minute because she did not immediately comply with their orders and even though she did not pose a threat to the officers or try to flee.   661 F.3d at 446 ("She actively resisted arrest insofar as she refused to get out of her car when instructed to do so and stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car.   Brooks did not evade arrest by flight, and no other exigent circumstances existed at the time.   She was seven months pregnant, which the officers knew, and they tased her three times within less than one minute, inflicting extreme pain on Brooks.").

Given the obvious and significant factual differences between those situations and this case, Plaintiff's reliance on *Jones* and *Mattos* is misplaced.   In light of the undisputed evidence that Plaintiff actively and physically resisted detention and arrest, posed a danger to the officers' safety, and thwarted their repeated attempts to restrain him using less-intrusive methods, *Jones* and *Mattos* did not clearly establish on October 31, 2018 that Officer Payne's actions in tasing Plaintiff twice (for five seconds and one second, respectively) would violate the Fourth Amendment.

### B.   The *Heck* Doctrine

Defendants also seek summary judgment on Count One the ground that Plaintiff's state-court conviction for resisting arrest precludes him, under the *Heck* doctrine, from asserting that Officers Payne and Conklin used excessive force.   Although it is unnecessary to reach this issue in light of the determination, in Part III.A above, that Defendants are entitled to summary judgment on Count One for other reasons, the Court will do so in an abundance of caution and in order to provide a more complete record in the event of an appeal.

"Under *Heck*, a section 1983 action is barred if success in the action would necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement. But if a criminal conviction has already been reversed, expunged, or otherwise set aside,

then a section 1983 action may proceed.  *Heck* thus requires [courts] to consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.  By contrast, if the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Lemos v. Cty. of Sonoma*, 40 F.4th 1002, 1005 (9th Cir. 2022) (en banc).  Defendants bear the burden of demonstrating that Plaintiff's success on his excessive force claim would necessarily imply the invalidity of his state-court conviction.  *See, e.g.*, *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1046 (9th Cir. 2018) (holding that *Heck* didn't bar plaintiff's § 1983 claims because "Defendants have not demonstrated that Reese's claims in this action are barred by *Heck*"); *Jarboe v. Cnty. Of Orange*, 293 Fed. App'x 520, 521 (9th Cir. 2008) ("[W]here the defendant relies on *Heck*, he has the burden of proving that the plaintiff's success will necessarily imply the invalidity of the plaintiff's underlying conviction.").

Here, Plaintiff was convicted of one count of resisting arrest in violation of A.R.S. § 13-2508(A)(2).  (Docs. 113-8, 113-9.)  There is no evidence that the conviction has been reversed, expunged, or otherwise invalidated.  According to Defendants, a conviction under § 13-2508(A)(2) necessarily acts as a *Heck* bar to an excessive force claim because "in Arizona, a person can only be convicted of resisting arrest when the arresting officer's conduct was 'lawful' when effecting the arrest."  (Doc. 113 at 7.)  In response, Plaintiff provides three reasons why *Heck* should not bar his excessive force claim: (1) a no-contest plea does not result in a conviction that implicates *Heck*; (2) alternatively, his excessive force claim would not necessarily undermine his conviction because a person can be convicted of violating A.R.S. § 13-2508 during an unlawful arrest; and (3) even if *Heck* bars a claim challenging the officers' use of force during Plaintiff's arrest, it does not bar a § 1983 claim based on the officers' use of force before or after the conduct that formed the basis of his conviction.  (Doc. 119 at 10-15.)

1        Plaintiff's first argument is unavailing—a conviction may trigger *Heck* even if it

2   was obtained via a no-contest plea.  The Ninth Circuit most recently addressed the

3   application of *Heck* to a § 1983 plaintiff who previously entered a no-contest plea in *Duarte*

4   *v. City of Stockton*, 60 F.4th 566 (9th Cir. 2023).  There, the plaintiff had previously entered

5   a no-contest plea to the crime of resisting arrest.  *Id.* at 571-72.  Although, under California

6   law, a court must "ordinarily" find a criminal defendant guilty upon the entry of such a

7   plea, a different procedure was followed in Duarte's case—his plea was held in abeyance

8   pending his compliance with certain conditions.  *Id.* at 571-72.  Critically, and unlike here,

9   "[a]fter the six months of abeyance elapsed, the charges . . . were 'dismissed' in the 'interest

10  of justice' on the prosecutor's motion."  *Id.* at 572.  The Ninth Circuit concluded that

11  "[b]ecause the charges against Duarte were dismissed, he was never convicted.   And

12  because there is no conviction that Duarte's § 1983 claims would impugn, *Heck* is

13  inapplicable."  *Id.*

14       This case is distinguishable for the obvious reason that the charges against Plaintiff

15  were not held in abeyance following his co-contest plea or later dismissed.  To the contrary,

16  after Plaintiff's no-contest plea was entered, the superior court found Plaintiff guilty of

17  violating § 13-2508 and imposed a probationary sentence.   This resulted in a valid

18  conviction under Arizona law.  *See generally In re Lazcano*, 222 P.3d 896, 898 (Ariz. 2010)

19  (noting that "Arizona law defines a conviction as a determination of guilt by verdict,

20  finding, or the acceptance of a guilty or no contest plea" and that a "no contest plea qualifies

21  as a conviction because like a guilty plea, a plea of no contest 'is an admission of guilt for

22  the purposes of the case") (cleaned up); *State v. Anderson*, 710 P.2d 456, 460 (Ariz. 1985)

23  ("[B]y entering a plea of no contest, 'a defendant does not expressly admit his guilt, but

24  nonetheless waives his right to a trial and authorizes the court for purposes of the case to

25  treat him as if he were guilty.'") (citation omitted).  Accordingly, Plaintiff was convicted

26  for purposes of *Heck*.

27       This conclusion is bolstered by *Taylor v. County of Pima*, 913 F.3d 930 (9th Cir.

28  2019).  There, Taylor was convicted of felony murder in 1972 after being found guilty

during a jury trial in Arizona state court, subsequently obtained new evidence that cast doubt on the prosecution's theory, and ultimately "entered into a plea agreement in 2013 under which the original convictions were vacated and, in their place, Taylor pleaded no contest to the same counts, was resentenced to time served, and was released from prison." *Id.* at 932.  Afterward, Taylor brought a § 1983 action in which he, among other things, sought "damages for wrongful incarceration stemming from the 42 years that he spent in prison." *Id.* at 935.  As relevant here, the Ninth Circuit held that "Taylor's 1972 jury conviction has been vacated by the state court, so *Heck* poses no bar to a challenge to that conviction or the resulting sentence.  *But Taylor's 2013 conviction, following his plea of no contest, remains valid*.  Accordingly, Taylor may not state a § 1983 claim if a judgment in his favor 'would necessarily imply the invalidity of his [2013] conviction or sentence.'" *Id.* (emphasis added).  As the italicized text makes clear, an Arizona state-court conviction obtained via a no-contest plea—which is exactly how Plaintiff's Arizona state-court conviction was obtained—may serve as the predicate for a *Heck* bar.

Finally, although Plaintiff cites two Ninth Circuit cases that purportedly stand for the proposition "that a no contest plea does not enact the *Heck* doctrine to bar a plaintiff's § 1983 claims" (Doc. 119 at 13-14), those cases do not support that proposition.  In *Ove v. Gwinn*, 264 F.3d 817 (9th Cir. 2001), although one of the underlying DUI convictions happened to arise from a *nolo contendre* plea, the *Heck* analysis did not turn on the format of the plea—instead, the court concluded that *Heck* was inapplicable to both plaintiffs (including the other plaintiff who had been convicted via guilty plea) because their § 1983 claims challenged "the way in which their blood was drawn" and "[t]he validity of their [DUI] convictions does not in any way depend on the legality of the blood draws." *Id.* at 823.  Similarly, in *Lockett v. Ericson*, 656 F.3d 892 (9th Cir. 2011), although the plaintiff's underlying conviction for "wet reckless" driving happened to arise from a *nolo contendre* plea, the *Heck* analysis did not turn on the nature of the plea—instead, as in *Ove*, the court concluded that *Heck* was inapplicable because the plaintiff's § 1983 claim challenged the legality of a warrantless search of his home and "[t]he validity of Lockett's conviction does

not in any way depend upon the legality of the search of his home." *Id.* at 895-97.

Plaintiff's second *Heck* argument turns on the nature of the crime he was convicted of committing. Arizona's resisting arrest statute, A.R.S. § 13-2508(A), provides:

> A person commits resisting arrest by intentionally preventing or attempting to prevent a person reasonably known to him to be a peace officer, acting under color of such peace officer's official authority, from effecting an arrest by:
>
> 1.   Using or threatening to use physical force against the peace officer or another.
>
> 2.   Using any other means creating a substantial risk of causing physical injury to the peace officer or another.
>
> 3.   Engaging in passive resistance.

*Id.* "[T]he acts listed in (A)(1) and (A)(2) are connected, describing the different means by which one might commit the offense of felony resisting arrest." *State v. Luviano*, 499 P.3d 350, 355 (Ariz. Ct. App. 2021), *review granted* (2022). Because "the means of resisting arrest identified in (A)(1) and (A)(2) are 'consistent with and not repugnant to each other,'" "one might threaten or use physical force and use 'any other means creating a substantial risk of causing physical injury to the peace officer or another' in the same event." *Id.* (citations omitted). Another Arizona statute, A.R.S. § 13-404(B)(2), provides that "[t]he threat or use of physical force against another is not justified . . . [t]o resist an arrest that the person knows or should know is being made by a peace officer or by a person acting in a peace officer's presence and at his direction, whether the arrest is lawful or unlawful, unless the physical force used by the peace officer exceeds that allowed by law . . . ." In other words, under § 13-404(B)(2), if an officer uses excessive force in effecting an arrest, the arrestee is justified in threatening or using physical force to resist the arrest. *See also State v. Celaya*, 660 P.2d 849, 854 (Ariz. 1983) (noting that § 13-404(B)(2) "justifies one's use of force to resist an arrest that the person knows or should know is being made by a peace officer if that officer is using force in excess of that allowed by law") (cleaned up).

Defendants argue that, because § 13-404 provides a justification defense for

resisting an excessively forceful arrest, Plaintiff's conviction necessarily involved a finding that the officers didn't use excessive force during the arrest sequence.  (Doc. 113 at 7.) Plaintiff challenges this assertion, arguing that "in Arizona a person can be convicted of resisting even an unlawful arrest" and, thus, a successful excessive force claim would not demonstrate the invalidity of his conviction.  (Doc. 119 at 10-11.)

At first blush, Defendants appear to have the better of this argument.  Due to the interplay between § 13-2508(A) (which prohibits the threat or use of force to resist arrest) and § 13-404(B)(2) (which justifies the threat or use of force to resist an excessively forceful arrest), a long line of Arizona district court decisions have concluded that a conviction under § 13-2508(A) necessarily shows that the quantum of force used during the arrest was not excessive—and, thus, acts as a *Heck* bar to a § 1983 claim premised on allegations that officers used excessive force while carrying out the arrest the plaintiff was convicted of unlawfully resisting.  *Ramsey v. City of Lake Havasu City*, 2021 WL 4316965, *6 (D. Ariz. 2021) ("A defendant can only be convicted of resisting arrest in Arizona if the officer's conduct was 'lawful' when effecting the arrest; an officer's conduct was not 'lawful' if he used excessive force.") (citing A.R.S. § 13-404(B)(2)); *Gause v. Mullen*, 2013 WL 5163245, *6 (D. Ariz. 2013) (same); *Hall v. City of Tempe*, 2013 WL 4079199, *2 (D. Ariz. 2013) (same); *Preston v. Alexander*, 2013 WL 1561062, *3 (D. Ariz. 2013) (same); *Dominguez v. Shaw*, 2011 WL 4543901, *4 (D. Ariz. 2011) (same); *Gamez v. Jarvis*, 2010 WL 1729120, *5 (D. Ariz. 2010) (same); *Lavender v. Goins*, 2007 WL 2288107, *3 (D. Ariz. 2007) (same).

But there is a wrinkle.  Although Defendants appear to view this case as factually indistinguishable from the string-cited cases listed above, the Court perceives one potentially significant difference—the court records provided by Defendants establish that Plaintiff was convicted of resisting arrest in violation of § 13-2508(A)*(2)*.  This means Plaintiff was convicted of "intentionally preventing or attempting to prevent" a peace officer "from effecting an arrest by . . . *[u]sing any other means* creating a substantial risk of causing physical injury to the peace officer or another."  *Id.*  In contrast, when a person

1    is convicted of violating subsection (A)*(1)* of the statute, the proscribed conduct is "[u]sing

2    or threatening to use physical force against the peace officer or another." *Id.*  This

3    juxtaposition suggests that, to violate § 13-2508(A)(2), the means of resistance must have

4    been something other than the use or threatened use of physical force. *Tulelake Irrigation*

5    *Dist. v. United States Fish & Wildlife Serv.*, 40 F.4th 930, 936 (9th Cir. 2022) ("When

6    construing a statute, courts should 'avoid any statutory interpretation that renders any

7    section superfluous.'").  *See also Luviano*, 499 P.3d at 355 ("the means of resisting arrest

8    identified in (A)(1) and (A)(2) are 'consistent with and not repugnant to each other'").

9         That Plaintiff was convicted of violating subsection (A)(2), and not (A)(1), is

10   potentially significant because the justification statute, A.R.S. § 13-404(B)(2), only

11   justifies the "[t]he threat or use of physical force." *Id.*  This suggests that § 13-404(B)(2)

12   is only a potential defense to violations of § 13-2508(A)(1), not (A)(2)—after all, a

13   defendant convicted of violating (A)(2) does not use or threaten to use physical force in

14   the first place).  This matters because the availability of a justification defense under

15   § 13-404(B)(2) is the reason courts have concluded that a necessary predicate for a resisting

16   arrest conviction is that the officers were using a lawful quantum of force when the arrestee

17   resisted.  If the justification defense is not available, the implication is also absent.  Put

18   another way, if Plaintiff's conviction under § 13-2508(A)(2) does not necessarily imply

19   that he resisted arrest by using or threatening to use physical force, it also does not

20   necessarily imply that he used force that was unjustified under § 13-404(B)(2).  And if §

21   13-404(B)(2) does not apply, there is no implication that the officers' use of force was

22   lawful.

23        With that said, in their briefing, neither side provides any meaningful analysis of

24   this issue.  Defendants assume that § 13-404(B)(2) applies but only cite cases involving

25   convictions under § 13-2508(A)(1) or § 13-2508(A) as a whole or convictions for

26   "resisting arrest" generally (with no specified statutory violation).[26]  Meanwhile, Plaintiff's

---

27   [26]    *See, e.g.*, *Micolo v. Cnty. of Pinal*, 2016 WL 614000, *3 (D. Ariz. 2016) (stating
that "Plaintiff has been convicted of resisting arrest in Arizona" but not citing any specific
28   statutory provision in relation to the conviction); *Dominguez*, 2011 WL 4543901 at *2
("[T]he Superior Court of Arizona in Maricopa County adjudicated S.D. delinquent for the

- 52 -

1    position about whether a justification defense under § 13-404(B)(2) would have

2    theoretically been available to him is somewhat ambiguous.  (*See, e.g.*, Doc. 119 at 12 ["As

3    stated above, § 13-404 is a defense to the crime of resisting arrest, however, it does not

4    mean that all of the Defendant Officers' use of force in this case was reasonable.  Assuming

5    arguendo that § 13-404(B)(2) were found by the jury to apply to [Plaintiff's] conduct for

6    combating a lawful arrest, the statute does not make all of the uses of force reasonable."].)

7         Notably, neither party cites (nor can this Court find) any case applying

8    § 13-404(B)(2) specifically to a conviction under § 13-2508(A)(2) or finding that a

9    conviction under § 13-2508(A)(2) necessarily implies that the officers used lawful force

10   throughout the entirety of the arrest sequence.  Given the absence of developed argument

11   on both sides, if this issue were dispositive, the Court might request supplemental briefing.

12   However, because Count One fails for independent reasons, supplemental briefing is not

13   necessary.  It was Defendants' burden to establish the existence of a *Heck* bar and, for the

14   reasons stated above, Defendants have not met that burden on this record.

15        Plaintiff's third *Heck* argument results in the same outcome.  Plaintiff relies on

16   *Smith*, which he characterizes as holding that "*Heck* [does] not apply when there are

17   separate instances of force used during different phases" of an officer's encounter with a

18   suspect, and argues that "the same analysis should apply" here because "the excessive force

19   occurred multiple times while the officers were effecting the arrest of [Plaintiff]."  (Doc.

20   119 at 11-12.)  Plaintiff also emphasizes that, because he entered a no-contest plea, he "did

21   not plead guilty to a set of facts."  (*Id.* at 11.)

22        Plaintiff is correct that if a suspect's encounter with law enforcement officers can

23   be divided into distinct phases, and the suspect was only convicted of resisting arrest during

24   one of those phases, *Heck* does not serve as a bar to a subsequent § 1983 action for

25   excessive force premised on the officers' use of force during the other phases.  Thus,

26

27   offense[] of resisting arrest in violation of A.R.S. § 13-2508 . . . ."); *Hall*, 2013 WL
     4079199 at *2 (citing to A.R.S. § 13-2508 generally); "); *Mitchell v. Demski*, 2007 WL
28   2023471, *4 (D. Ariz. 2007) (describing a conviction for resisting arrest in Arizona but not
     citing any specific statutory provision); *State v. Fontes*, 986 P.2d 897, 899 (Ariz. Ct. App.
     1998) (A.R.S. § 13-2508(A) generally).

officers who continue using force after a suspect has been arrested may be sued for excessive force even if the suspect engaged in unlawful resistance during the arrest sequence.  *See, e.g.*, *Smith*, 394 F.3d at 698 ("Under *Heck*, Smith would be allowed to bring a § 1983 action . . . if the use of excessive force occurred subsequent to the conduct on which his conviction was based.  Specifically, Smith would be entitled to proceed below if his conviction were based on unlawful behavior that took place while he stood alone and untouched on his porch—that is, if his unlawful conduct occurred while the officers were attempting to investigate his wife's complaint. . . .  There were two different phases of the officers' conduct here."); *Sanford v. Motts*, 258 F.3d 1117, 1120 (9th Cir. 2001) ("Excessive force used after an arrest is made does not destroy the lawfulness of the arrest.  Sanford's conviction required that Motts be acting lawfully in the performance of his duties 'at the time the offense against him was committed.'  Hence, if Motts used excessive force subsequent to the time Sanford interfered with his duty, success in her section 1983 claim will not invalidate her conviction.  *Heck* is no bar.") (internal citation omitted).  Were the rule otherwise, "it would imply that once a person resists law enforcement, he has invited police to inflict any reaction or retribution they choose, while forfeiting the right to sue for damages.  Put another way, police subduing a suspect could use as much force as they wanted—and be shielded from accountability under civil law—as long as the prosecutor could get the plaintiff convicted on a charge of resisting.  This would open the door to undesirable behavior and gut a large share of the protections provided by § 1983." *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006).

With that said, to the extent Plaintiff's third *Heck* argument turns on the premise that he is suing for excessive force that was exerted either before or after the arrest phase, this argument lacks merit.  The first challenged use of force in this case is when the officers grabbed Plaintiff's wrists in an unsuccessful attempt to handcuff Plaintiff and the last challenged use of force was the second taser strike, which also occurred before the officers were able to handcuff Plaintiff.  There is no allegation, let alone evidence, that the officers continued exerting force after the handcuffs were applied.  Although, as discussed above

in Part III.A.1.a, the parties dispute when the initial grab should be considered an attempted arrest or attempted *Terry* stop for Fourth Amendment purposes, it is clear that the grab was part of the process of "effecting an arrest" for purposes of § 13-2508.  *State v. Flores*, 260 P.3d 309, 312 n.1 (Ariz. Ct. App. 2011) ("[T]he act of 'effecting arrest,' for the purposes of the resisting arrest statute, is on-going *beginning with the officer's first physical contact* and continuing even after the arrest may be 'complete' under the law.") (emphasis added); *State v. Mitchell*, 62 P.3d 616, 618 (Ariz. Ct. App. 2003) ("Based on the language of A.R.S. § 13-2508 and the common meaning of the verb 'effect,' we construe the term 'effecting' in § 13–2508 to mean an on-going process toward achieving, producing, making, or bringing about, an arrest.  Until the arrest has been 'effected,' the arrest process remains ongoing and the resisting arrest statute is applicable.  Accordingly, 'effecting an arrest' is a process with a beginning and an end.  Often, the process is very brief and the arrest is quickly completed.  In some situations, however, the process of 'effecting' an arrest will occur over a period of time and may not be limited to an instantaneous event, such as handcuffing.").

Meanwhile, to the extent Plaintiff's third *Heck* argument is that the arrest phase itself may have included both lawful and unlawful uses of force, the analysis is more complicated.  Under the laws of some states, such as California, even if the arrest sequence itself comprises a single, continuous chain of events, that chain of events may be composed of both lawful and unlawful uses of force by the arresting officers.  *Lemos*, 40 F.4th at 1007-08 ("Holton argues that Lemos's conviction was 'based on the entire incident as a whole' and that Lemos could not have been convicted 'if any part of Deputy Holton's use of force during the incident was excessive.'  If that were true, it would not matter which of the four predicate acts the jury agreed on because a finding that Holton used excessive force would invalidate her conviction.  That reasoning, however, cannot be reconciled with the jury instructions in Lemos's underlying criminal case or with California law. . . .  Under the instructions, an officer could have been lawfully performing his duties at time A even if, at some later time B, he used excessive force.  So if the jury found that Lemos resisted

Holton at the truck and that Holton was acting lawfully at the time, it should have found her guilty, even if it also believed that Holton used excessive force when he tackled her five minutes later."); *id.* at 1008 (citing decisions by California appellate courts recognizing that, under California law, "[t]he use of excessive force after the completed section 148(a)(1) violation [resisting arrest] would not invalidate the completed section 148(a)(1) violation") (citations omitted). *See also Hooper v. Cty. of San Diego*, 629 F.3d 1127, 1131 (9th Cir. 2011) ("Four years after *Smith*, the California Supreme Court held that a conviction under § 148(a)(1) can be valid even if, during a single continuous chain of events, some of the officer's conduct was unlawful.  According to the Court, a conviction under § 148(a)(1) requires only that some lawful police conduct was resisted, delayed, or obstructed during that continuous chain of events.  In other words, the California Supreme Court interpreted the elements of § 148(a)(1) differently than did the [earlier California appellate decision] upon which we relied in *Smith*.") (citations omitted).  Accordingly, when addressing the *Heck* implications of a resisting-arrest conviction arising from a state that, like California, recognizes that the arrest sequence may include both lawful and unlawful uses of force, it is necessary to perform a detailed analysis of the record from the underlying criminal case to determine "which acts formed the basis for the conviction." *Id.* at 1006.  "When the conviction is based on a guilty plea, we look at the record to see which acts formed the basis for the plea.  We follow the same approach when the conviction is based on a jury verdict . . . [and] must look at the record of the criminal case—including the jury instructions—to determine which facts the jury necessarily found."  *Id.* (citations omitted).[27]

---

[27]    This is the sort of analysis that was performed in both of the cases cited in one of Plaintiff's supplemental notices (Doc. 129), which addressed the *Heck* implications of convictions under various California resisting arrest statutes.  *Sanders v. City of Pittsburg*, 14 F. 4th 968, 971 (9th Cir. 2021) ("Sanders was charged with resisting arrest under § 148(a)(1) . . . .  [A]n excessive force claim can't survive the *Heck* bar if it's predicated on allegedly unlawful actions by the officer at the same time as the plaintiff's conduct that resulted in his § 148(a)(1) conviction.");  *King v. City of Fontana*, 2022 WL 1016668, *5 (C.D. Cal. 2022) ("King pleaded guilty to felony resisting an officer under [California Penal Code] Section 69, which prohibits knowingly resisting an officer in the performance of his or her duty by threat or 'use of force or violence' . . . [but] King's excessive force claim does not necessarily negate his guilty plea: the factual basis for the plea includes use of a handgun, which King no longer held at the time Tusant shot him. . . .  Accordingly,

If such an analysis were required here, Defendants would likely be unable to meet their burden of proving a *Heck* bar.  Although the documents provided by Defendants reveal that Plaintiff entered a no-contest plea to the offense of "Count 1 (As Amended) Resisting Arrest (13-2508A2)" and that the date of the offense was "10/31/2018" (Doc. 113-9 at 2), the charging instrument itself is not part of the record, so there is no way to discern what facts were alleged.  Additionally, due to the no-contest nature of Plaintiff's plea, there is no agreed-to factual basis in the plea agreement.  Although, as discussed above in relation to Plaintiff's first *Heck* argument, the no-contest nature of the plea does not undermine the validity of Plaintiff's conviction for *Heck* purposes, it does complicate the factual inquiry that would be required to establish the *Heck* bar arising from a conviction under California's resisting arrest statute.  *See, e.g.*, *Martin v. City of Vallejo*, 2016 WL 2764741, *4 (E.D. Cal. 2016) ("The court notes that a violation of § 148(a) can be based on various conduct during the course of a person's encounter with an officer. Here, there remains an absence of evidence or information relating to the factual basis for plaintiff's no contest plea and criminal conviction for violating § 148.  Accordingly, the court cannot conclude that plaintiff's excessive force claim necessarily implies the invalidity of his conviction.") (citations omitted).

The question is whether the same sort of factual analysis is required when analyzing the *Heck* implications of a conviction for resisting arrest under A.R.S. § 13-2508(A). *Hooper*, 629 F.3d at 1133 ("To the extent the state law under which a conviction is obtained differs, the answer to the *Heck* question could also differ.").  In the Court's estimation, this is a deceptively difficult question without a definitive answer.

On the one hand, it is possible to find, in *State v. Sanders*, 575 P.2d 822 (Ariz. Ct. App. 1978), language suggesting that a conviction for resisting arrest under § 13-2508(A) necessarily implies that the arresting officers' use of force was reasonable throughout the entirety of the arrest phase.  *Id.* at 826 ("[n]o unnecessary or unreasonable force shall be

---

King's excessive force claim against Tusant does not 'necessarily imply the invalidity of his criminal conviction,' because Tusant's alleged use of excessive force occurred after the conduct for which King was convicted.") (citations omitted).

used in making an arrest").  Many Arizona district courts have cited *Sanders* as establishing that a § 1983 plaintiff who has been convicted of resisting arrest under § 13-2508(A) is *Heck*-barred from bringing an excessive force claim that challenges the officers' use of force at any point during the arrest sequence.  *See, e.g.*, *Ticknor v. Hinsberg*, 2011 WL 13190182, *4 (D. Ariz. 2011), *aff'd sub nom. Ticknor v. Hinsburg*, 481 F. App'x 391 (9th Cir. 2012) (citing *Sanders* and holding that "Plaintiff's conviction for resisting arrest means that any force used in effecting the arrest was reasonable"); *Mitchell*, 2007 WL 2023471 at *4 (citing *Sanders* in support of the proposition that "[a] defendant can only be convicted of resisting arrest in Arizona if the officer's conduct was "lawful" when effecting the arrest").  Other Arizona district courts have, in turn, relied on those earlier decisions when applying the same categorical rule.  *See, e.g.*, *Micolo*, 2016 WL 614000 at *2-3 (citing *Mitchell* in support of the conclusion that although "some states" hold that "an individual can be convicted of resisting arrest even if the arrest was not lawful," "Arizona is one of the . . . states" where "the lawfulness of the arrest is an element of the crime of resisting arrest . . . [and thus] a valid conviction will bar an excessive force claim"); *Hall*, 2013 WL 4079199 at *2 (citing *Mitchell* in support of the conclusion that "[a] person can be found guilty of resisting arrest only if the arresting officer's conduct when making the arrest was lawful").

Several other considerations also support the conclusions reached in the above-cited cases.  For one thing, Plaintiff has not cited any Arizona decision, or federal decision applying Arizona law, holding that a defendant may be convicted of resisting arrest in violation of A.R.S. § 13-2508(A) even though some of the force used by the arresting officer during the arrest sequence was excessive.  Additionally, there are notable textual differences between Arizona's resisting arrest statutes and California's corresponding statutes—Arizona's justification defense allows a person "[t]o resist *an arrest* . . . [when] the physical force used by the peace officer exceeds that allowed by law," A.R.S. § 13-404(B)(2) (emphasis added), whereas California law imposes liability whenever a person "willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or

attempt to discharge *any duty* of his or her office or employment," Cal. Penal Code § 148(a)(1) (emphasis added).   These differences arguably suggest that the use or threatened use of physical force to resist an arrest is justified in Arizona whenever any part of "an arrest" involves excessive force (so, conversely, the absence of justification in that scenario means that no part of the arrest involved excessive force), whereas California criminalizes resistance to "any duty" discharged by a peace officer (which may involve only one component of the overall arrest sequence, and thus a § 148(a) conviction does not necessarily imply that the entirety of the arrest sequence was lawful).   Finally, it is notable that the Ninth Circuit once understood California's resisting arrest statute as implying that all of the force used during the arrest sequence was lawful—it took a clarifying decision by the California Supreme Court to cause the Ninth Circuit to change course.   *Hooper*, 629 F.3d at 1131 ("[I]f [*Smith*] was based on a correct understanding of § 148(a)(1), Hooper's excessive force claims are barred under *Heck*, for . . . Hooper's arrest was effectuated in a single continuous chain of events lasting a very brief time.   However, . . . [f]our years after *Smith*, the California Supreme Court held that a conviction under § 148(a)(1) can be valid even if, during a single continuous chain of events, some of the officer's conduct was unlawful. . . .   The [California Supreme] Court's decision . . . mean[s] that our understanding of § 148(a)(1) was wrong. . . .   We are, of course, bound by the California Supreme Court's interpretation of California law.   We therefore apply *Heck* to § 148(a)(1) as the California Supreme Court interpreted it . . . .") (citations omitted).   In contrast, the Arizona Supreme Court has not clarified that a conviction under § 13-2508(A) can be valid despite the officers' use of unlawful force at some point during the arrest.

On the other hand, and putting aside the fact (as discussed in relation to Plaintiff's second *Heck* argument) that the cases on which Defendants rely seem to address convictions under § 13-2508(A)(1) rather than § 13-2508(A)(2), a careful review of *Sanders* suggests that it may provide a shaky foundation for the legal principle it has been cited so many times as establishing.   In *Sanders*, the defendant was convicted of the crime of aggravated battery (not resisting arrest) after he kicked Officer Cooper in the face while

Officer Cooper was in the process of "effectuating an arrest" of the defendant's wife (who herself had just resisted arrest by biting another officer's thumb and then fleeing).  575 P.2d at 823-24.  On appeal, the defendant raised a sufficiency-of-the-evidence challenge to his aggravated battery conviction, under the theory "that the record conclusively establishes that Officer Cooper used excessive force in making the arrest and that therefore [defendant's] act in kicking the officer in the face to protect or defend his wife was justified."  *Id.* at 826.  The Arizona Court of Appeals rejected this contention and affirmed.  After noting that "[t]he jury was instructed that no unnecessary or unreasonable force shall be used in making an arrest and that excessive force used by a[n] officer may be countered lawfully," the court held that "it very clearly appears that there was ample evidence from which the jury could have concluded that Officer Cooper used no more force than was necessary to effect an arrest of Mrs. Sanders, who from much of the testimony appears to have been actively and forceably resistful."  *Id.*

As this summary makes clear, *Sanders* had no reason to address (and did not address) whether a resisting-arrest conviction necessarily implies that the quantum of force used by the arresting officers remained reasonable throughout the entirety of the arrest sequence.  Indeed, *Sanders* does not even describe the force that was used by Officer Cooper, much less break it into components and decide whether each component was lawful.  Additionally, although the passage in *Sanders* that "no unnecessary or unreasonable force shall be used in making an arrest" might appear, in isolation, to support the notion that Arizona law requires all of the force used during the arrest sequence to be lawful, this was not the *Sanders*'s holding but merely a recitation of the jury instruction that happened to be given at trial (and was not challenged on appeal).

At bottom, whether *Heck* applies to Plaintiff's conviction, which arises under § 13-2508(A)(2) and was achieved via a no-contest plea bereft of factual determinations, is a complicated issue that requires a thorough analysis of Arizona state law.  As with Plaintiff's second *Heck* argument, the Court might consider requesting supplemental briefing on this issue if it were dispositive.  Nevertheless, because Count One fails for

1  independent reasons, the Court merely notes that the questions raised (but not definitively

2  resolved) above provide additional reasons why Defendants failed to meet their burden of

3  establishing that Count One is *Heck*-barred.

4  II.   Count Two

5        In Count Two, Plaintiff asserts a § 1983 claim against the City, premised on three

6  theories of municipal liability: (1) the existence of an unconstitutional policy, practice, or

7  custom of using excessive force; (2) failure to train or supervise its officers on the proper

8  use of force; and (3) ratification of the conduct of Officers Payne and Conklin.  (Doc. 108

9  ¶¶ 38-78.)[28]  More specifically, Plaintiff contends that the City viewed the officers' use of

10  excessive force as in accordance with its policies and did not investigate or review the

11  officers' conduct.  (Doc. 119 at 22.)  He points to testimony from the City's representative,

12  Commander Sorenson, who averred that Officers Payne and Conklin acted "within policy"

13  (in particular, "Tempe Police Order 12.101," which "describes the use of force policy for

14  the City") as "overwhelming evidence of ratification by [the City]."  (*Id.* at 7, 23-25.  *See*

15  *also id.* at 26 ["Commander Sorensen . . . stated there was no investigation into the actions

16  of Officers Payne and Conklin.  Moreover, [the City] itself confirmed that the actions of

17  Officers Payne and Conklin were not only within [the City's] policy or customs, but were

18  part and parcel of those customs.  Based upon this, [the City] confirmed that no policy

19  violation took place.  Other courts have ruled that similar conduct is sufficient to plausibly

---

[28]      It is not entirely clear whether Plaintiff is proceeding on the ratification theory alone or continues to assert all of the three theories.  (*See, e.g.*, Doc. 119 at 22 ["[Plaintiff] has asserted viable *Monell* claims against [the City] based upon ratification.  [Plaintiff] has provided evidence that it was within [the City's] custom or policy and that the [the City] failed to investigate the officers conduct but determined that it was within its customs or policy . . . ."].  *See also id.* at 27 ["[The City] confuses [Plaintiffs'] allegations on refusal to train and deficient policy, practice or custom.  [Plaintiff] alleges these facts because the ratification of Defendant Officers' conduct also establishes that there is a deficient training and supervision of Tempe Police Officers.  Moreover, the repeated use of a Taser, and significant 'hands on' force against any individual establishes constitutionally deficient custom, practices, or policies.  Defendants confuse and conflate these three separate theories, and the elements needed to prove each, ultimately misunderstanding (and misleading this Court about) what Plaintiff must demonstrate to succeed on his *Monell* claims based upon the City's ratification of its own officers' conduct."].)  However, to the extent Plaintiff intended to abandon his first two theories (*i.e.*, custom or policy and failure to train), this distinction does not change the Court's conclusion that Count Two fails as a matter of law.

1    allege that the municipality ratified the unconstitutional actions of those officers."].)

2         The Court agrees with Defendants (Doc. 113 at 15) that, because municipal liability is contingent on a constitutional violation, the Court's conclusion in Part III.A.1 that Officers Payne and Conklin did not violate Plaintiff's constitutional rights compels summary judgment in the City's favor on Count Two as well.  *See, e.g.*, *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th Cir. 2008) ("Because there is no constitutional violation, there can be no municipal liability."); *Micolo*, 2016 WL 614000 at *4 ("Plaintiff cannot prevail on a *Monell* claim against Pinal County without first proving that his constitutional rights were violated.").  This makes it unnecessary to reach the merits of the Defendants' other reasons for seeking summary judgment on Count Two.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 113) is **granted.**

**IT IS FURTHER ORDERED** that judgment is not yet entered at this time, due to the City's outstanding counterclaim.  (Doc. 29 at 9-12.)

Dated this 28th day of March, 2023.

Dominic W. Lanza
United States District Judge